IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

GAVIN POWER, LLC,

                Plaintiff,

    v.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY, and MICHAEL S.
REGAN in his official capacity as
ADMINISTRATOR OF THE UNITED
STATES ENVIRONMENTAL
PROTECTION AGENCY,

                Defendants.

Case No. 2:24cv41

## **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Plaintiff Gavin Power, LLC ("Gavin") brings this Complaint for Declaratory and Injunctive Relief ("Complaint") against Defendants U.S. Environmental Protection Agency ("EPA") and Michael S. Regan in his official capacity as Administrator of EPA, and alleges as follows:

## **NATURE OF THE ACTION**

1. This is a Complaint for judicial review under the Administrative Procedure Act ("APA") of the final action taken by EPA titled: Final Decision: Denial of Alternative Closure Deadline for General James M. Gavin Plant, Cheshire, Ohio, EPA-HQ-OLEM-2021-0590-0100 (Nov. 18, 2022) ("Final Gavin Denial"); *see also* 87 Fed. Reg. 72,989 (Nov. 28, 2022).

2. Plaintiff Gavin operates the General James M. Gavin Plant in Cheshire, Ohio ("Facility"), a coal-fired electric generation facility that includes three regulated coal combustion residual ("CCR") disposal units subject to regulation under Title 40 CFR Part 257, Subpart D,

including two CCR surface impoundments known as the Bottom Ash Pond and the Fly Ash Reservoir, as well as a landfill known as the Residual Waste Landfill.

3.      Pursuant to the Resource Conservation and Recovery Act, 42 U.S.C. § 6901 *et seq*. ("RCRA"), EPA promulgated federal standards for the safe disposal of CCR in CCR units, known as the "CCR Rule."   A "CCR surface impoundment" (or sometimes referred to as "impoundment" in the relevant regulations) is defined as "a natural topographic depression, man-made excavation, or diked area … designed to hold an accumulation of CCR and liquids, and the unit treats, stores, or disposes of CCR."   40 C.F.R. § 257.53.   In contrast, a "CCR landfill" or "landfill" is defined as "an area of land or an excavation that receives CCR … [including] sand and gravel pits and quarries that receive CCR, CCR piles, and any practice that does not meet the definition of a beneficial use of CCR."  *Id*.

4.      Gavin takes environmental health and safety very seriously and has operated its CCR units in compliance with the CCR Rule.

5.      In 2020, EPA set a deadline for unlined CCR surface impoundments to cease receiving waste and initiate closure, with a mechanism allowing companies to request an extension of that deadline.  40 C.F.R. § 257.101(a)(1).  Because of the extended timeline of EPA's rulemaking, Gavin requested an extension of time to stop receiving waste in the unlined Bottom Ash Pond, as did dozens of other facilities.

6.      The Final Gavin Denial rejected Gavin's request for an extension of the deadline to cease receiving CCR and non-CCR waste in, and initiate closure of, the Bottom Ash Pond. EPA's bases for denying Gavin's extension request included factual findings specific to the Facility, as well as the application of those factual findings to new nationwide requirements regarding closure of CCR surface impoundments that EPA announced for the first time in the

2

context of the Gavin proceeding. EPA's promulgation of new nationwide requirements, without complying with the procedural requirements of RCRA and the APA, is currently the subject of multiple petitions for review in the U.S. Court of Appeals for the District of Columbia Circuit. In contrast, this case seeks to vacate EPA's Facility-specific factual findings and requests declaratory and injunctive relief concerning EPA's unlawful application of both existing and new requirements to the Facility in the Final Gavin Denial.

## PARTIES

7.    Gavin is the entity that operates the Facility, implements and complies with EPA regulations at the Facility, and applied for a temporary extension of a deadline for ceasing placement of waste in the Bottom Ash Pond.

8.    Defendant EPA is an "agency" of the United States federal government, within the meaning of the APA, 5 U.S.C. § 701(b)(1).

9.    Defendant Michael S. Regan is the Administrator of EPA and is being sued in his official capacity.

## JURISDICTION AND VENUE

10.    This Court has jurisdiction pursuant to the APA. 5 U.S.C. §§ 703-04. The challenged action is a final agency action "for which there is no other adequate remedy in a court." 5 U.S.C. § 704. And the action is, thus, reviewable "in a court of competent jurisdiction." 5 U.S.C. § 703. The U.S. District Court for the Southern District of Ohio is a court of competent jurisdiction because competency is construed as requiring subject matter jurisdiction and personal jurisdiction. This Court has original subject matter jurisdiction because district courts have original jurisdiction over "all civil actions arising under the . . . laws . . . of the United States," 28 U.S.C. § 1331, and the APA is such a law. This Court has personal jurisdiction because Plaintiff

is properly serving Defendants.  Fed. R. Civ. P. 4(i); 28 U.S.C. 1391(e).  Administrator Regan is properly a defendant pursuant to 5 U.S.C. § 702 because Gavin seeks an injunctive decree.

11.     Venue properly lies in the Southern District of Ohio pursuant to 28 U.S.C. § 1391(e)(1)(c), because the Facility resides in this district, and pursuant to 28 U.S.C. § 1391(e)(1)(b), because a substantial part of the events or omissions giving rise to the claims occurred in this district, and all of the property that is the subject of the action is situated in this district.

## STATUTORY AND REGULATORY BACKGROUND

12.     This case arises under RCRA and concerns the Final Gavin Denial.

13.     RCRA provides the statutory framework for the regulation of solid waste.  Subtitle D of RCRA provides for collaborative federal and State regulation of non-hazardous solid waste, 42 U.S.C. §§ 6941-6949a, while Subtitle C prescribes stringent minimum standards for the management of hazardous waste implemented through either the federal Subtitle C regulations or a State's regulations that EPA has determined are at least as stringent.  *Id.* §§ 6921-6939g.  EPA regulates CCR as non-hazardous solid waste under the Subtitle D criteria.  *Id*. § 6945(d).

14.     EPA's principal role under Subtitle D is to adopt federal guidelines for States to manage nonhazardous wastes.  EPA's guidelines "provide minimum criteria to be used by the States to define those solid waste management practices which constitute the [prohibited] open dumping of solid waste."  *Id*. § 6907(a)(3).  With respect to CCR, States may adopt State regulatory programs that, once approved by EPA, operate "in lieu of" EPA's criteria.  *Id*. § 6945(d).  Where States do not adopt a CCR regulatory program, EPA can enforce the criteria, which remain self-implementing through certifications from Qualified Professional Engineers until EPA establishes its own permit program, which it has not yet done.  *Id*.

4

15.　　Congress requires EPA to follow the procedural requirements of the APA and additional statutory procedures in RCRA before promulgating new criteria. New Subtitle D criteria must be "promulgate[d] [as] regulations" "after consultation with the States, and after notice and public hearings." *Id.* § 6944(a); *see also id.* §§ 6907(a), 6974(b)(1). And EPA must "notify [Congress] a reasonable time before publishing any suggested guidelines or proposed regulations under [RCRA] of the content of such proposed suggested guidelines or proposed regulations." *Id.* § 6907(b).

**The 2015 Rule**

16.　　After years of regulatory review, risk assessment, consultations with States, public input, and reports to Congress, EPA promulgated the first RCRA criteria specific to CCR in 2015. 80 Fed. Reg. 21,301 (Apr. 17, 2015), codified at 40 C.F.R. Part 257, Subpart D ("2015 Rule" or the "CCR Rule" when discussed in conjunction with later revisions).

17.　　Consistent with RCRA's statutory framework at the time, the criteria are self-implementing standards. 80 Fed. Reg. at 21,330. To that end, the regulations set forth "sufficiently objective and technically precise" requirements to enable implementation by regulated parties with the oversight and certification of Qualified Professional Engineers. *Id.* at 21,335.

18.　　The 2015 Rule includes restrictions on the location of CCR units (*e.g.*, in relation to wetlands or seismic zones); requirements for groundwater monitoring and analysis for specified constituents; deadlines for facilities to stop adding material to CCR units that do not meet regulatory criteria for operating units; and closure and post-closure care requirements. 40 C.F.R. §§ 257.60-.64, 257.90-.93, 257.100-.104.

19.　　The 2015 Rule also establishes requirements for "corrective action" (*e.g.*, groundwater remediation) when monitored levels exceed regulatory thresholds. 40 C.F.R. §§

5

257.94-98. All CCR units are required to undergo detection monitoring whereby owners or operators of a CCR unit conduct consistent groundwater sampling and analysis to measure for "Appendix III constituents."[1] *Id*. § 257.94. If statistically significant increases in Appendix III constituents are detected, then the facility has 90 days to either: (a) prepare an Alternate Source Demonstration, a detailed technical demonstration showing a statistically significant increase was caused by a source other than the CCR unit; or (b) enter into a more intensive "assessment monitoring" program. *Id*. § 257.94(e). In assessment monitoring, the owner or operator of a CCR unit must conduct sampling and analysis for both Appendix III and Appendix IV constituents. *Id*. § 257.95. If there is a detection of a release from a CCR unit, or if any Appendix IV constituent is detected at a statistically significant level exceeding the applicable groundwater protection standards and no Alternate Source Demonstration is made, the owner or operator must assess potential corrective measures and then both take and document any corrective action necessary to attain the applicable groundwater protection standard and reduce or eliminate future releases to the maximum extent feasible. *Id*. § 257.96-.98.

20. The closure requirements of the 2015 Rule provide that a CCR surface impoundment may be closed "*either* by leaving the CCR in place and installing a final cover system *or* through removal of the CCR and decontamination of the CCR unit" (the latter of which is commonly referred to as "clean closure" or "closure by removal"). 40 C.F.R. § 257.102(a) (emphases added). As EPA explained at the time, the 2015 Rule does not "require clean closure

---

[1] A detection monitoring program must monitor for the constituents listed in Appendix III to Title 40 C.F.R. Part 257: boron, calcium, chloride, fluoride, pH, sulfate, and total dissolved solids ("TDS"). 40 C.F.R. § 257.94(a). An assessment monitoring program must monitor for Appendix III constituents as well the constituents listed in Appendix IV to Title 40 C.F.R. Part 257: antimony, arsenic, barium, beryllium, cadmium, chromium, cobalt, fluoride, lead, lithium, mercury, molybdenum, selenium, thallium, and radium 226 and 228 combined. *Id*. § 257.95.

nor … establish restrictions on the situations in which clean closure would be appropriate," but instead "allows the owner or operator to determine whether clean closure or closure with the waste in place is appropriate for their particular unit." 80 Fed. Reg. at 21,412. Indeed, EPA "anticipate[d] that facilities w[ould] mostly likely *not* clean close their units, given the expense and difficulty of such an operation." 75 Fed. Reg. 35,128, 35,208 (June 21, 2010) (emphasis added). Where the operator chooses closure-in-place, to protect groundwater, the regulations require post-closure groundwater monitoring for a minimum of thirty years. 40 C.F.R. § 257.104(c)(1). During that thirty-year period, if groundwater monitoring in an assessment monitoring program triggers relevant regulatory thresholds, corrective action provided under the regulations is required. *Id.* §§ 257.94-.98(c)(1).

21.     As to the closure-in-place option at issue here, the performance standard requires that before installing a cover system "[f]ree liquids []be eliminated by removing liquid wastes or solidifying the remaining wastes and waste residues." *Id.* § 257.102(d)(2)(i). Additionally, any "[r]emaining wastes must be stabilized sufficient to support the final cover system." *Id.* § 257.102(d)(2)(ii). In EPA's words, the purpose of Section 257.102(d)(2)(i) is to "drain the CCR unit," 80 Fed. Reg. at 21,413, which "reduces the hydraulic head" created by "free liquids that are ponded in the impoundment." EPA, *Human and Ecological Risk Assessment of Coal Combustion Residuals* K-1 (Dec. 2014) ("EPA Risk Assessment") (attached hereto as **Exhibit A**). And, post-closure, "[t]he final rule requires that *any final cover system* control, minimize or eliminate, to the maximum extent practicable, post-closure infiltration of liquids into the waste and releases of leachate (in addition to CCR or contaminated run-off) to the ground or surface waters." 80 Fed. Reg. at 21,413 (emphasis added) (referencing regulatory language in 40 C.F.R. § 257.102(d)(1)(i)); *see also* 40 C.F.R. § 257.102(b)(1)(iii) ("The closure plan must also discuss

how the final cover system will achieve the performance standards specified in paragraph (d) of this section."); 80 Fed. Reg. at 21,413 ("final cover system" must "minimize" "infiltration" and "releases of leachate"). As noted above, EPA established "sufficiently objective and technically precise" requirements for the final cover system so that "a qualified professional engineer will be able to certify that [the closure performance standards] have been met[.]" *Id*. at 21,335; *see*, *e.g.*, 40 C.F.R. § 257.102(d)(3).

22.     When EPA issued the 2015 Rule, EPA was aware that CCR surface impoundments had CCR in contact with groundwater, noting that EPA's assessment found that they "come in direct contact with the water table . . . ." EPA Risk Assessment at 5-10. Indeed, EPA had previously proposed to ban placement of CCR below the "natural water table" through a "location restriction." 75 Fed. Reg. 35,128, 35,199 (June 21, 2010). Yet, contrary to its initial proposal in 2010, EPA did not include a definition of "natural water table" in the 2015 Rule or a prohibition requiring CCR surface impoundments not be in direct contact with the water table. 75 Fed. Reg. at 35,199; 80 Fed. Reg. at 21,361-62. And EPA stated in the preamble to the final 2015 Rule, "EPA did *not* require clean closure nor [] establish restrictions on the situations when clean closure would be appropriate." 80 Fed. Reg. at 21,412 (emphasis added). Moreover, in response to comments on this issue, EPA explained that the 2015 Rule does not limit closure options based on proximity to the water table:

> Comment: "Will removal of CCR be required in cases where the base of an existing or abandoned surface impoundment or landfill is shown to be below the natural water table? Will removal be required even if the monitoring plan data indicates that no contamination of the natural groundwater has or is occurring?"
>
> EPA Response: "If a unit fails to meet the location criteria applicable to existing CCR units, the unit must initiate closure as required under the rule. These closure requirements are

fully discussed in Unit VI of the preamble.[2]  This rule does *not* require clean closure of any unit.  All CCR units covered by the rule will also be subject to groundwater monitoring requirements and corrective action."

EPA, Comment Summary and Response Document, Vol. 9, EPA-HQ-RCRA-2009-0640-12132, at 197 (Dec. 2014) (emphasis added).

23.     The 2015 Rule also required that an owner or operator of a CCR unit "maintain a publicly accessible internet site (CCR website) containing all the information specified in this section."  40 C.F.R. § 257.107(a).  The information EPA specified as being required for public inspection on the CCR website includes twenty (20) different types of enumerated documents specific to closure of a CCR unit—some of which require annual or even semi-annual progress updates.  *Id.* § 257.107(i).  Facilities were required to establish these CCR websites within six months of the 2015 Rule's April 17, 2015 publication.  80 Fed. Reg. at 21,429.

24.     Gavin has complied with the 2015 Rule.  Since promulgation of the 2015 Rule, the Facility has implemented its requirements fully, undertaking significant investments, including by:  installing and operating groundwater monitoring systems; planning, commencing, and completing closure of the Fly Ash Reservoir according to the requirements of the 2015 Rule; and creating and maintaining a CCR compliance website.

### The 2020 Part A Rule

25.     In 2020, EPA promulgated a number of amendments to the 2015 Rule, including what is known as the Part A Rule.  85 Fed. Reg. 53,516 (Aug. 28, 2020) ("Part A Rule").  As relevant here, in the Part A Rule, EPA established a deadline of April 11, 2021 by which unlined

---

[2] This section of the preamble summarizes, among other things, the performance standards for closure-in-place, *see* 80 Fed. Reg. at 21,414, and for post-closure care, *see id.* at 21,425-26.

CCR surface impoundments must cease receiving CCR and non-CCR waste and initiate closure. 40 C.F.R. § 257.101(a)(1).

26.     EPA also promulgated new provisions allowing facilities to seek temporary extensions of the deadline to cease receipt of waste in unlined CCR surface impoundments if the facility lacked "alternative disposal capacity." *Id.* § 257.103(f)(1).  To obtain an extension, applicants needed to demonstrate that, among other things, the facility "is in compliance with all of the requirements of this subpart." *Id*. § 257.103(f)(1)(iii), (f)(2)(iii).

27.     Before granting an extension, EPA was required to post each proposed deadline extension approval or denial on EPA's website for limited public comment.  The Part A Rule specified that "[t]his process is not a rulemaking" that is intended to satisfy the procedural requirements for promulgating new RCRA criteria.  85 Fed. Reg. at 53,552.

28.     Applications for extensions under the Part A Rule were due by November 30, 2020.  40 C.F.R. § 257.103(f)(3)(i).

29.     Gavin timely submitted a Part A demonstration seeking an extension of the deadline to cease receipt of waste and commence closure of the Bottom Ash Pond on the basis that the Facility lacked alternative disposal capacity.  In making this submission, Gavin relied upon its compliance with the applicable CCR regulations:  the 2015 Rule (the remaining Part A Rule provisions did not modify relevant portions of the CCR Rule).

### The 2022 "Rule"

30.     On January 11, 2022, EPA announced new requirements in a coordinated and cross-referencing package of press statements and publications, including EPA's proposed denial

10

of Gavin's Part A application,[3] which suddenly implemented these new requirements for the first time without prior public notice or the required rulemaking process (collectively, the "2022 'Rule'"). The statements of general, nationwide applicability within the 2022 "Rule" regarding the closure of CCR units are the subject of ongoing litigation, challenged as an unlawful legislative rule because they were issued without the procedural protections afforded by RCRA and the APA, among other errors. *Electric Energy, Inc. v. U.S. Environmental Protection Agency*, No. 22-1056, Dkt. #1976606 at 1 (D.C. Cir. Filed Dec. 6, 2022) (challenging the nationwide requirements announced in the Proposed Gavin Denial).

31. In the 2022 "Rule", EPA revised at least two key components of the existing regulations by adopting more stringent criteria: (1) the closure options and performance standards in 40 C.F.R. § 257.102; and (2) the scope and coverage of the CCR regulations as set forth in 40 C.F.R. § 257.50 and § 257.53.

32. First, as to the closure requirements, the 2022 "Rule" announced a new classification of CCR units: "surface impoundments or landfills … with coal ash in contact with groundwater." "EPA Takes Key Steps to Protect Groundwater from Coal Ash Contamination" (Jan. 11, 2022) ("EPA Press Release").[4] Whereas the 2015 Rule allowed, for all CCR units, either closure with waste in place or closure by removal of all waste, 40 C.F.R. § 257.102(a), the 2022 "Rule" for the first time decreed that CCR units "with coal ash in contact with groundwater" must be closed by removal, EPA Press Release.

---

[3] Proposed Decision: Proposed Denial of Alternative Closure Deadline for General James M. Gavin Plant, EPA-HQ-OLEM-2021-0590-0002 (Jan. 11, 2022) ("Proposed Gavin Denial").

[4] https://www.epa.gov/newsreleases/epa-takes-key-steps-protect-groundwater-coal-ash-contamination.

33.     Second, as to the scope and coverage change, EPA's new prohibition on closure in place was based on new definitions of the terms "infiltration" and "free liquids" used in the closure performance standards in 40 C.F.R. § 257.102(d)(1)(i) and (2)(i).  The 2022 "Rule" for the first time defines "infiltration" to mean "*any liquid* passing into or through a CCR unit by filtering or *permeating from any direction*, including the top, *sides, and bottom of the unit*."  Proposed Gavin Denial at 47 (emphases added).  Similarly, "free liquids" is newly defined to mean "the freestanding liquid in the impoundment and … all separable porewater in the impoundment, whether the porewater was derived from sluiced water"—meaning the water that transports CCR from a power plant to an impoundment—"or groundwater that intersects the impoundment."  *Id*. at 46.  Taken together, EPA contended that these definitions require a prohibition against closure-in-place for CCR units with waste below the water table.

34.     As part of EPA's promulgation of the 2022 "Rule" on January 11, 2022, EPA sent notice to the Georgia Environmental Protection Division citing the Proposed Gavin Denial as providing an explanation of its new waste-below-the-water-table prohibition and related closure requirements, and urging the Georgia Environmental Protection Division to review its pending and issued CCR permits to determine whether those permits were consistent with the new requirements.  On the same day, EPA also sent letters to other regulated entities announcing that the new waste-below-the-water-table prohibition and related closure requirements applied to their operations.

## FACTUAL BACKGROUND

### Gavin's Extension Request

35.     On November 30, 2020, Gavin submitted a timely Part A demonstration seeking an extension of the deadline to cease receipt of waste and commence closure of the Bottom Ash Pond, pursuant to 40 C.F.R. § 257.103(f)(1)(iv).  EPA deemed the application complete on

January 11, 2022, in a separate action from the Proposed Gavin Denial.  Gavin Completeness Letter, EPA-HQ-OLEM-2021-0590-0041 (Jan. 11, 2022).

36.     Gavin's Part A demonstration sought approval to continue to receive CCR and non-CCR waste streams at the Bottom Ash Pond until May 4, 2023.  Gavin Power, LLC, *Site-Specific Alternative Deadline Demonstration to Initiate Closure of CCR Surface Impoundment, Gavin Plant Bottom Ash Pond* at 1 (Nov. 30, 2020) (attached hereto as **Exhibit B**).  This additional period of time (beyond the default April 11, 2021 deadline to cease receipt of waste and commence closure for unlined CCR surface impoundments) was necessary to enable the Facility to eliminate or find alternatives for non-CCR waste streams that also utilized the Bottom Ash Pond.  Specifically, prior to closing the Bottom Ash Pond, the Facility had to:  (1) convert the wet-sluicing bottom ash handling equipment in each of the two power generating units to a dry-handling system; and (2) design and commission a temporary wastewater treatment system to treat the Facility's non-CCR waste streams during Bottom Ash Pond closure and construction of a process water pond.  *Id.* at 14, 28.  Without these modifications, closing the Bottom Ash Pond would have meant the Facility would have to cease generating electricity.

## EPA's Proposed Gavin Denial

37.     On January 11, 2022, EPA proposed to deny Gavin's extension request.  In doing so, EPA acknowledged that Gavin's plan to construct a dry-handling system for the plant's bottom ash and a new basin for non-CCR waste streams was "the option with the shortest compliance schedule," EPA, *Proposed Decision: Proposed Denial of Alternative Closure Deadline for General James M. Gavin Plant* at 30-31 (Jan. 11, 2022) (attached hereto as **Exhibit C**), and thus that Gavin could not cease use of the Bottom Ash Pond to manage those waste streams any faster than May 2023—Gavin's requested extension date.  Nonetheless, EPA proposed to deny the extension, asserting that in evaluating the entire Facility EPA found, "Gavin has not demonstrated

13

that the facility is in compliance with all the requirements of 257 subpart D."  *Id*. at 15.  Among other issues, EPA proposed "to determine that Gavin has not adequately demonstrated compliance with the closure regulations at 40 C.F.R. § 257.102(b) and (d)" with regard to both the Bottom Ash Pond, for which Gavin sought an extension of the deadline to cease receipt of waste, and the Fly Ash Reservoir, a separate CCR surface impoundment at the Facility that was not a subject of Gavin's extension request.  *Id*. at 39.

38.     As to the Fly Ash Reservoir, in proposing this determination, EPA failed to acknowledge that the Fly Ash Reservoir had already been closed for nearly six months by the time of the Proposed Gavin Denial.  The Facility's prior owner, American Electric Power Generation Resources, Inc. ("AEP"), had prepared a closure plan for the Fly Ash Reservoir in 2013, and revised that plan in 2016 ("Fly Ash Reservoir Closure Plan")—both with the oversight and approval of the Ohio Environmental Protection Agency ("OEPA").  AEP created and timely posted extensive documentation about the Fly Ash Reservoir closure, including posting the 2016 revised Fly Ash Reservoir Closure Plan on its publicly-accessible CCR compliance website, which was established by October 19, 2015, as required by the 2015 Rule.  40 C.F.R. § 257.107(i).  Gavin continues to maintain and update the Facility's CCR compliance website ("Gavin Compliance Website", available at http://gavinpowerccr.com/documents/).

39.     On October 23, 2015, AEP finalized a notice of AEP's intent to close the Fly Ash Reservoir in accordance with the OEPA-approved closure plan.  AEP, Notice of Intent to Close Gavin Generating Station Stingy Run Fly Ash Pond (Oct. 23, 2015) (attached hereto as **Exhibit D**).  This notice included a certification by a Qualified Professional Engineer that the final cover system detailed in the closure plan met the regulatory requirements of 40 C.F.R. § 257.102(d)(3)(i).  On September 16, 2016, OEPA issued Permit to Install No. DSWPTI1086919,

which permitted AEP to close the Fly Ash Reservoir with CCR in place in accordance with the Fly Ash Reservoir Closure Plan and the 2015 Rule. Ohio, Permit to Install No. DSWPTI1086919 (Sept. 16, 2016) ("Permit to Install"). This permit went through OEPA's notice and comment process and the final action was appealable. On July 30, 2021, after approximately four years of construction, a Qualified Professional Engineer certified that the Fly Ash Reservoir had completed closure-in-place and that the closure met the requirements of both the written closure plan and the 2015 Rule—*i.e.*, EPA's codified and current closure regulations. *Notification of Closure and Closure Certification Gavin Generating Station Stingy Run Fly Ash Pond* (July 30, 2021) ("Notice of Fly Ash Reservoir Closure") (attached hereto as **Exhibit E**). Gavin promptly posted its Notice of Fly Ash Reservoir Closure and associated closure certification on the Gavin Compliance Website—nearly six months before the Proposed Gavin Denial.

40. At no point in this process—which spanned nearly a decade—did EPA ever raise any concern or alleged impropriety regarding the Fly Ash Reservoir closure's plan, execution, or regulatory compliance. EPA raised no concern despite the fact that Fly Ash Reservoir closure documentation had been posted to the Gavin Compliance Website for years, as required by the 2015 Rule.

41. Not only did EPA ignore that the Fly Ash Reservoir had already been closed before EPA issued the Proposed Gavin Denial, but EPA also chose to evaluate the Fly Ash Reservoir's closure for retroactive compliance with EPA's *new* closure requirements in the 2022 "Rule"— announced for the first time on January 11, 2022.

42. As for the Bottom Ash Pond, which was the actual subject of the extension request, Gavin maintains that it met the requirements of 40 C.F.R. § 257.103(f)(1) to support an alternative closure deadline of May 4, 2023. Nevertheless, after receiving the Proposed Gavin Denial, Gavin

voluntarily undertook two measures to address EPA's proposed determinations regarding closure timing and closure design for the Bottom Ash Pond:

(a)     Gavin accelerated the initiation of the Bottom Ash Pond closure by six months—at significant additional expense and difficulty.  Comments of Gavin Power, LLC at 80 (Mar. 25, 2022) ("Gavin Comments") (attached hereto as **Exhibit F**).  This required Gavin to, among other things, work with its contractors to accelerate the relevant construction and delivery schedules and also obtain permission from the regional transmission organization to move up the dates of the planned Facility outage.  (As a major power plant in the region, the Facility cannot voluntarily cease generating power without coordination and approval from its regulators.)

(b)     Gavin redesigned the project to close the Bottom Ash Pond by removing the CCR (clean closure) rather than closing with CCR in place.  *Id.*

### EPA's Final Gavin Denial

43.     Despite Gavin's redesign and acceleration of the Bottom Ash Pond closure plan, on November 28, 2022, EPA finalized its denial of Gavin's extension request for the Bottom Ash Pond and published a notice of availability of its decision in the Federal Register.  87 Fed. Reg. 72989 (Nov. 28, 2022).  The Final Gavin Denial applies to the Facility the regulatory interpretations announced in the 2022 "Rule", including the new waste-below-the-water-table prohibition and related closure requirements.  The Final Gavin Denial also based those new requirements on EPA's new definition of "impoundment" in which EPA ignored the regulatory definition in the 2015 Rule (40 C.F.R. § 257.53) in favor of a dictionary definition.  Final Gavin Denial at 39.

44.     Although this case challenges the Final Gavin Denial's factual findings specific to the Facility and EPA's application of new requirements as to the Facility alone, the Final Gavin

Denial also reiterates the new requirements of general, nationwide applicability. For example, EPA explained that its new waste-below-the-water-table prohibition and related closure requirements are based on regulations that "must be met at every unit," not just the units at the Facility. Final Gavin Denial at 32. These statements of general, nationwide applicability are at issue in the two pending cases before the U.S. Court of Appeals for the D.C. Circuit, including one protective petition. *Electric Energy, Inc. v. U.S. Environmental Protection Agency*, No. 23-1035 (consolidated with Nos. 23-1036, 23-1037, 23-1038) (all protective petitions); *Electric Energy, Inc. v. U.S. Environmental Protection Agency*, No. 22-1056 (petition for review of 2022 "Rule").

45. EPA premised its extension denial for the Bottom Ash Pond in large part on the Fly Ash Reservoir's alleged non-compliance with EPA's newly announced waste-below-the-water-table prohibition and related closure requirements in the 2022 "Rule", stating that Fly Ash Reservoir closure was "paramount" to EPA's decision. Respondent EPA's Proposed Briefing Format at 3, *Electric Energy, Inc. v. U.S. Environmental Protection Agency*, No. 22-1056 (D.C. Cir. filed July 7, 2023); *see also* Final Gavin Denial at 5. Only by applying the 2022 "Rule" retroactively did EPA find that the Fly Ash Reservoir was not "closed consistent with 40 C.F.R. § 257.102(d)" (the closure performance standard for closure-in-place). Final Gavin Denial at 5. EPA also retroactively applied the 2022 "Rule" to determine that the Fly Ash Reservoir Closure Plan failed to comply with various other portions of the closure performance standard for closure-in-place. *Id.* at 44-45 (determinations of noncompliance with 40 C.F.R. §§ 257.102(d)(1)(i), (d)(1)(ii), and (d)(2)(i)).

46. In EPA's determination that the Fly Ash Reservoir was not closed consistent with the newly announced waste-below-the-water-table prohibition and related closure requirements,

EPA also alleged that there was "potential for waste constituents to be dissolved and to migrate" from the Fly Ash Reservoir. *Id.* at 42. However, there is an extensive, Qualified Professional Engineer-certified groundwater monitoring network for the Fly Ash Reservoir, and even after extensive groundwater sampling and analysis of this network, no statistically significant increases in relevant constituents were identified in 2021 or 2022. Gavin Power, LLC, 2022 Annual Groundwater Monitoring and Corrective Action Report ("2022 Annual GWMCA") at ES-1, 3, 13 (Jan. 31, 2023);[5] Gavin Power, LLC, 2021 Annual Groundwater Monitoring and Corrective Action Report at ES-1, 9-10 (Jan. 31, 2022).[6] Thus, the Fly Ash Reservoir remains in detection monitoring, with no observed basis to initiate more intensive assessment monitoring or take groundwater corrective action. 2022 Annual GWMCA at ES-1, 3.

47. EPA's inclusion of the Fly Ash Reservoir in the Final Gavin Denial was not a mere oversight; when EPA issued the Final Gavin Denial the Agency had actual knowledge that the Fly Ash Reservoir had been closed for nearly a year and a half. In addition to the fact that the Fly Ash Reservoir Closure Plan and substantial additional documentation had been available on the Gavin Compliance Website for years, on March 24, 2022 (nearly eight months before EPA issued the Final Gavin Denial) AEP emphasized to EPA that the Fly Ash Reservoir had been closed, with a properly-issued OEPA Permit to Install and Qualified Professional Engineer certification, pursuant to EPA's self-implementing 2015 Rule. Comments of AEP Generation Resource Inc. at 10 (Mar. 24, 2022) (attached hereto as **Exhibit G**).[7] AEP included as attachments copies of

---

[5] http://gavinpowerccr.com/wp-content/uploads/2023/03/Annual-Groundwater-Monitoring-and-Corrective-Action-Report-–-1-31-2023.pdf.

[6] http://gavinpowerccr.com/wp-content/uploads/2022/02/Annual-Groundwater-Monitoring-and-Corrective-Action-Report-–-1-31-2022.pdf.

[7] The rulemaking docket, including all comments, is available at https://www.regulations.gov/docket/EPA-HQ-OLEM-2021-0590.

the OEPA approval, the Qualified Professional Engineer certification, and the July 30, 2021 Notice of Fly Ash Reservoir Closure.

48. EPA's Final Gavin Denial also made determinations of non-compliance with respect to other CCR units at the Facility, despite the Facility's compliance with the relevant regulations:

(a) EPA determined that certain of the Facility's Alternate Source Demonstrations were not sufficiently supported under the regulations. *Id.* at 54-70. Because EPA determined that the Facility's Alternate Source Demonstrations were inadequate, EPA also determined that the Bottom Ash Pond, Fly Ash Reservoir, and Residual Waste Landfill groundwater monitoring systems should be in "assessment monitoring" under the 2015 Rule. EPA's determination regarding the Alternate Source Demonstrations was based on EPA's inaccurate assertions regarding groundwater flow direction, EPA's dismissal of regional groundwater data prepared by the independent U.S. Geological Survey, and site-specific data gathered at the Facility, and as it relates to the Bottom Ash Pond, EPA's inaccurate characterization of the permeability of the silty clay layer underlying the Bottom Ash Pond. Contradicting EPA's determinations regarding the sufficiency of Gavin's Alternate Source Demonstrations, each of these demonstrations was properly supported under the regulations. Gavin Comments at Section V.A.1. *First*, based on the available information, including site-specific potentiometric data, Gavin sufficiently characterized the groundwater flow direction at the units, and the designs of the units' groundwater monitoring systems are adequately supported by these thorough characterizations in accordance with 40 C.F.R. § 257.91(b)(1). *Second*, Gavin demonstrated that the silty-clay layer underlying the Bottom Ash Pond is sufficiently

impermeable, as the silty-clay layer has a permeability ranging well within EPA's permeability criteria provided in 40 C.F.R. § 257.102(d)(3)(i)(A). This conclusion regarding impermeability is also supported by the lower concentration of boron in the Bottom Ash Pond surface water than in the groundwater downgradient of the Bottom Ash Pond; the only science-based explanation for this is that boron in the groundwater is coming from a source of higher concentration of boron than exists in the Bottom Ash Pond. *Third*, both regional U.S. Geological Survey data and site-specific data show the potential for bedrock groundwater to be the source of Appendix III constituents at the Bottom Ash Pond; for example, maximum measured concentrations of several constituents in groundwater from background wells at the Facility are significantly above those observed in wells downgradient of the Bottom Ash Pond. Notably, each of the Facility's Alternate Source Demonstrations was prepared and certified by a Qualified Professional Engineer in accordance with the self-implementing 2015 Rule, 40 C.F.R. § 257.94(e). *See, e.g.*, Gavin Power, LLC, 2018 Annual Groundwater Monitoring and Corrective Action Report at App. A (Jan. 31, 2019)[8] (Gavin Bottom Ash Complex Alternate Source Demonstration Report dated July 3, 2018, including professional engineer certification).

(b)  EPA took issue with aspects of the statistical methods used when assessing the Facility's groundwater monitoring data, including the treatment of background monitoring well data and the decision not to pool background data. Final Gavin Denial at 49-54. However, Gavin followed the statistical procedure requirements. *First*, Gavin complied with 40 C.F.R. § 257.93(a) by utilizing consistent sampling and analysis

---

[8]  http://gavinpowerccr.com/wp-content/uploads/2021/10/Annual-Groundwater-Monitoring-and-Corrective-Action-Report-–-1-31-2019-3.pdf.

procedures designed to ensure monitoring results that provide an accurate representation of groundwater quality at the background and downgradient wells required by 40 C.F.R. § 257.91. *Second*, Gavin complied with 40 C.F.R. § 257.93(f)(3) by selecting the prediction interval procedure. Under this approach, Gavin established an interval for each constituent from the distribution of background data and compared, on a semi-annual basis, the level of each constituent in each compliance well to the prediction limit. *Third*, Gavin complied with 40 C.F.R. § 257.94(c) by monitoring groundwater as follows: (a) the number of samples collected were appropriate for the selected statistical method; (b) eight rounds of background and downgradient samples were collected prior to October 7, 2017, in accordance with 40 C.F.R. § 257.94(b); and (c) at least one sample from each background and downgradient well was collected during each semiannual sampling event, in accordance with 40 C.F.R. § 257.94(c). Gavin also followed EPA's March 2009 Unified Guidance titled *Statistical Analysis of Groundwater Monitoring Data at RCRA* Facilities, which the Preamble to the final Part A Rule suggests that owners and operators of CCR units refer to for additional information with regard to background data statistical analysis. 85 Fed. Reg. at 53,543. Pursuant to the 2015 Rule, this statistical method was reviewed and certified by a Qualified Professional Engineer in 2017 as being "appropriate for evaluating the groundwater monitoring data for [each of the CCR units] of the Gavin Power Plant in accordance with the requirements of 40 C.F.R. 257.93" and has been available to the public on Gavin's Compliance Website since that time. ERM, *Statistical Method Certification* at 3 (Oct. 16, 2017); *see also* Gavin Comments at Section V.A.2 (providing that this statistical approach has been consistently taken and publicly available since Gavin's first Annual GWMCA Report in 2017).

(c)     EPA determined the Facility failed to demonstrate that the groundwater monitoring networks for the Bottom Ash Pond, Fly Ash Reservoir, and Residual Waste Landfill complied with certain regulatory requirements.  Final Gavin Denial at 5.  Gavin disagreed with EPA's determinations.  Gavin Comments at 23-34, 60-68.  A Qualified Professional Engineer reviewed the necessary design and installation information and certified that both the original monitoring networks and previously updated monitoring networks complied with the relevant regulations.  *Id.* at 69-70.

49.     Ultimately, the Final Gavin Denial rejected Gavin's proposed May 4, 2023 deadline to cease receipt of waste at the Bottom Ash Pond and, instead, imposed an April 12, 2023 deadline—22 days earlier.  87 Fed. Reg. at 72,989.  Nowhere did EPA explain how an acceleration of a mere 22 days from Gavin's requested extension date supports the goals of the Part A Rule.  Regardless, Gavin subsequently met EPA's deadline to initiate closure at tremendous expense, operational challenge, and disruption.  Gavin Power, LLC, Notice of Intent to Close Bottom Ash Pond (Apr. 7, 2023).[9]

### COUNT I
**Violation of the Administrative Procedure Act**
**(Unlawful Reliance on Improper Rulemaking without Notice and Comment)**

50.     The allegations contained in paragraphs 1 through 49 above are incorporated as though fully set forth herein.

51.     The APA provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of the relevant statute, is entitled to judicial review thereof."  5 U.S.C. § 702.

---

[9]     http://gavinpowerccr.com/wp-content/uploads/2023/05/Notice-of-Intent-Bottom-Ash-Pond-Closure.pdf.

52.     Pursuant to the APA, any "rule" promulgated by an agency must be published in accordance with notice-and-comment procedures.  5 U.S.C. § 553.

53.     EPA's Final Gavin Denial is a final agency action.

54.     EPA's revision of the closure performance standard at 40 C.F.R. § 257.102(d)(1) to define the terms "infiltration" and "free liquid" to prohibit any liquid passing into or through a CCR unit by filtering or permeating from any direction, including the sides and bottom of a CCR unit, was a substantive change to the CCR Rule that did not undergo notice and comment rulemaking under the APA.

55.     EPA's revision of the closure performance standard at 40 C.F.R. § 257.102(d)(1) to define the terms "infiltration" and "free liquid" to require the removal of all groundwater from a CCR unit prior to installation of a final cover system was a substantive change to the CCR Rule that did not undergo notice and comment rulemaking under the APA.

56.     EPA relied upon and applied these two regulatory revisions to the Fly Ash Reservoir closure in the Gavin Final Denial in violation of the APA.

57.     EPA's application of these regulatory revisions to the Fly Ash Reservoir closure exceeded EPA's lawful authority and its action is arbitrary and capricious.

58.     Application of each of these two improper regulatory revisions to Gavin constitutes a prejudicial error because EPA's compliance determinations based on these improper rulemakings and the closure requirements applied to the Fly Ash Reservoir closure in the Final Gavin Denial continue to cause Gavin injury.

<u>**COUNT II**</u>
**Violation of the Administrative Procedure Act**
**(Arbitrary and Capricious Action and/or Abuse of Discretion)**

59.     The allegations contained in paragraphs 1 through 49 above are incorporated as though fully set forth herein.

60.     The APA empowers this Court to set aside a final agency action where, as here, the agency action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

61.     EPA's Final Gavin Denial is a final agency action.

62.     EPA exceeded its authority by applying its new requirements to the Fly Ash Reservoir and attempting to require a revision to the Fly Ash Reservoir Closure Plan for a reason that is not specifically enumerated in the regulations.

63.     EPA erred in determining that the Fly Ash Reservoir is not closed in compliance with the Closure Performance Standards.  Final Gavin Denial at 14-42.

64.     EPA erred in determining that the Fly Ash Reservoir Closure Plan "does not comply with 40 C.F.R. § 257.102(b)(1)."  Final Gavin Denial at 42-45.

65.     EPA erred in determining that Gavin's groundwater monitoring network at the Bottom Ash Pond is inadequate.  Final Gavin Denial at 45-49.

66.     EPA erred in determining that Gavin's statistical analyses with respect to groundwater were not done in compliance with the regulations.  Final Gavin Denial at 49-54.

67.     EPA erred in determining that groundwater monitoring wells at the Bottom Ash Pond should be in assessment monitoring.  Final Gavin Denial at 52-54.

68.     EPA erred in determining that groundwater monitoring wells within the Fly Ash Reservoir/Residual Waste Landfill combined groundwater monitoring network should be in assessment monitoring.  Final Gavin Denial at 52-54.

69.     EPA erred in determining that Gavin's Alternate Source Demonstrations at the Bottom Ash Pond were inadequate.  Final Gavin Denial at 54-57.

70. EPA erred in determining that Gavin's Alternate Source Demonstrations for the Fly Ash Reservoir/Residual Waste Landfill combined groundwater monitoring network were inadequate. Final Gavin Denial at 54-70.

71. EPA erred in determining that the Fly Ash Reservoir/Residual Waste Landfill combined groundwater monitoring network is inadequate. Final Gavin Denial at 70-75.

72. EPA erred in determining that Gavin "has not met the requirement to present a detailed plan of the fastest technically feasible schedule to complete the measures necessary for its alternative capacity technology". Final Gavin Denial at 76-79.

73. Each of these actions and determinations is arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law. Each is independently sufficient to establish a violation of the APA.

74. Each of these actions and determinations constitutes a prejudicial error because EPA's compliance assessment and the closure requirements in the Final Gavin Denial continue to cause Gavin injury and subject Gavin to additional, unjustified enforcement efforts against the Facility.

### <u>COUNT III</u>
**Violation of the Administrative Procedure Act**
**(Deprivation of Fair Notice and/or Procedural Due Process)**

75. The allegations contained in paragraphs 1 through 49 above are incorporated as though fully set forth herein.

76. The Fair Notice Doctrine restricts the penalties agencies may impose when their regulatory interpretations have not been announced with sufficient clarity.

77. The Due Process Clause of the Fifth Amendment to the U.S. Constitution prohibits the federal government from depriving any person of "life, liberty, or property, without due

process of law." Procedural Due Process requires notice and an opportunity to be heard in a meaningful way before a governmental deprivation.

78.     Gavin has constitutionally-protected interests, which include the right to operate one's business, the property interest in its revenues, and fees paid to Gavin for the power it provides, all of which constitute significant property rights subject to due process protections.

79.     The APA empowers the Court to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B).

80.     EPA's Final Gavin Denial is a final agency action.

81.     EPA's new requirements depart from the plain language of the closure performance standards at 40 C.F.R. § 257.102(d) and EPA's prior reading in a way that could result in significant civil penalties and drastic costs with respect to the Fly Ash Reservoir closure, so EPA was required to provide Fair Notice of its new requirements to Gavin as a member of the regulated public.

82.     EPA's new requirements would render the Fly Ash Reservoir's closure void after many years of effort and investment, but EPA did not expressly raise its new requirements either during 2015 Rule rulemaking nearly a decade ago or during the many State proceedings to approve facility closure plans under the CCR Rule that had occurred since then, until January 11, 2022.

83.     The Facility spent millions of dollars over multiple years to close the Fly Ash Reservoir under a properly-issued OEPA Permit to Install that authorized the construction activities necessary to close the Fly Ash Reservoir pursuant to the most recent regulations at that time: the 2015 Rule.

84.     The Facility invested significant amounts of time and money in designing and operating groundwater monitoring systems in compliance with the 2015 Rule, and making all required groundwater monitoring information available to EPA's specifications on the CCR Compliance Website.

85.     The Facility has a right to know what conduct is prohibited and to be afforded an opportunity to conform its conduct accordingly.  By applying new requirements for CCR closure to the Facility with essentially retroactive effect and no notice before the Fly Ash Reservoir was closed, Gavin was deprived of that opportunity.

86.     EPA's new requirements are substantive change to the CCR Rule that must undergo notice and comment rulemaking under the APA.  By failing to do so, EPA deprived Gavin of Fair Notice and Due Process in violation of the APA.

87.     EPA's compliance assessment and application of the closure requirements in the Final Gavin Denial continue to cause Gavin injury.

**COUNT IV**
**Waiver**

88.     The allegations contained in paragraphs 1 through 49 above are incorporated as though fully set forth herein.

89.     For years, EPA had actual or constructive knowledge of the Fly Ash Reservoir Closure Plan, the documentation and progress of the Fly Ash Reservoir's closure, and the Facility's groundwater monitoring network and analysis.

90.     As required by EPA's CCR Rule, the Facility timely created the CCR Compliance Website, timely uploaded documents thereto, and maintained and updated the website.

91.     EPA had access, for years and in the manner EPA specified by regulation, to all the required documentation detailing the Fly Ash Reservoir closure plans, Fly Ash Reservoir closure progress, and the Facility's groundwater monitoring network and analysis.

92.     EPA was able to assess the Fly Ash Reservoir closure's compliance with the CCR Rule, both as planned before construction commenced, and then as implemented while construction progressed for over four years.  EPA was also able to assess the Facility's groundwater monitoring network and analysis during this time period.

93.     EPA could have commented on OEPA's 2016 Permit to Install that allowed the Fly Ash Reservoir closure to proceed pursuant to the Fly Ash Reservoir Closure Plan.

94.     EPA could have informed—but did not inform—the Facility at any point during the five-year, multi-million-dollar closure process that the way in which AEP was closing the Fly Ash Reservoir would, under EPA's understanding of RCRA's requirements, not allow the unit to meet the applicable closure performance standards.

95.     EPA could have informed—but did not inform—the Facility of any concerns or alleged noncompliance with respect to the Facility's groundwater monitoring network and analysis.

96.     EPA did not inform Gavin of any purported noncompliance regarding the Fly Ash Reservoir closure before the Fly Ash Reservoir was closed, which preceded the Proposed Gavin Denial in 2022.

97.     EPA did not inform Gavin of any purported noncompliance regarding the Facility's groundwater monitoring network and analysis until the Proposed Gavin Denial in 2022.

98.     EPA affirmatively represented, in EPA's December 2014 responses to comments on what would become the 2015 Rule, that the CCR Rule "does not require clean closure of any

unit," such that closure in place for the Fly Ash Reservoir would be a permissible closure method under the CCR Rule.

99.     To the extent EPA had a right to challenge the adequacy of Gavin's Fly Ash Reservoir closure, the Fly Ash Reservoir Closure Plan, or the Facility's groundwater monitoring, EPA's conduct amounted to the voluntarily relinquishment of any such right.

100.    EPA therefore waived its right to determine in the Final Gavin Denial that the Fly Ash Reservoir closure, related documentation, or the Facility's groundwater monitoring did not comply with the CCR Rule.

**COUNT V**
**Estoppel**

101.    The allegations contained in paragraphs 1 through 49 above are incorporated as though fully set forth herein.

102.    For years, EPA had actual or constructive knowledge of the Fly Ash Reservoir Closure Plan, documentation and progress of the Fly Ash Reservoir's closure, and the Facility's groundwater monitoring network and analysis.

103.    As required by EPA's CCR Rule, the Facility timely created the CCR Compliance Website, timely uploaded documents thereto, and maintained and updated the website.

104.    EPA had access, for years and in the manner EPA specified by regulation, to all the required documentation detailing the Fly Ash Reservoir closure plans, and Fly Ash Reservoir closure progress, and the Facility's groundwater monitoring network and analysis.

105.    EPA was able to assess the Fly Ash Reservoir closure's compliance with the CCR Rule, both as planned before construction commenced, and then as implemented while construction progressed for over four years.   EPA was also able to assess the Facility's groundwater monitoring during this time period.

106.     EPA could have commented on OEPA's 2016 Permit to Install that allowed the Fly Ash Reservoir closure to proceed as planned.

107.     For years, EPA had the opportunity to inform Gavin that the Fly Ash Reservoir closure, related documentation, or groundwater monitoring did not comply with the CCR Rule.

108.     EPA could have informed—but did not inform—the Facility at any point during the four-year, multi-million-dollar closure construction process that the way in which AEP was closing the Fly Ash Reservoir would, under EPA's understanding of RCRA's requirements, not allow the unit to meet the applicable closure performance standards.

109.     EPA could have informed—but did not inform—the Facility of any concerns or alleged noncompliance with respect to the Facility's groundwater monitoring.

110.     EPA's decision not to inform the Facility until 2022 of EPA's determination that the Fly Ash Reservoir closure plan was noncompliant induced the Facility to spend millions of dollars over multiple years to complete closure as planned.

111.     EPA's decision not to inform the Facility until 2022 of EPA's determination that the Facility's groundwater monitoring network and analysis was noncompliant induced the Facility to request a Part A extension and proceed with the groundwater monitoring program in reliance on the CCR's Rule's unambiguous design, under which a Qualified Professional Engineer's certification of a groundwater monitoring program's compliance with each of the CCR Rule's performance requirements to regulatory specifications establishes compliance with the CCR Rule.

112.     EPA's affirmative representation, in EPA's December 2014 responses to comments on what would become the 2015 Rule, that the CCR Rule "does not require clean

closure of any unit" induced the Facility to pursue—and complete—closure in place for the Fly Ash Reservoir as a permissible closure method under the CCR Rule.

113.    Gavin's reliance on (1) EPA's silence as to the Fly Ash Reservoir closure's plan and progress; (2) the sufficiency of the Permit to Install for closure of the Fly Ash Reservoir issued by Ohio EPA in 2016 and not challenged at any point; (3) the sufficiency of the Facility's groundwater monitoring network and analysis; and (4) EPA's December 2014 representation that the CCR Rule did not require clean closure of any CCR unit, were all reasonable and in good faith.

114.    EPA is estopped from challenging the adequacy of Gavin's Fly Ash Reservoir closure, the Fly Ash Reservoir Closure Plan, or related documents and data in the Final Gavin Denial where the Fly Ash Reservoir Closure Plan was initially approved over seven years ago and the supporting data has been available to EPA for five years or more.

115.    EPA is estopped from now challenging the compliance of the Facility's groundwater monitoring network in the Final Gavin Denial when they were constructed in compliance with the applicable 2015 Rule and all required monitoring information has been available to EPA for years.

## **PRAYER FOR RELIEF**

Wherefore, Plaintiff respectfully requests that this Court grant the following relief:

A.    Assume jurisdiction over this matter;

B.    Issue a declaratory judgment, holding unlawful and setting aside EPA's unlawful, arbitrary, and capricious decisions as to the Facility identified herein;

C.    Vacate EPA's determinations in the Final Gavin Denial concerning regulatory compliance at the Facility and enjoin EPA from enforcement action based on the vacated determinations;

D.      Award Plaintiff attorney's fees, costs, and interests as permitted by law; and

E.      Grant such further and other relief as may be just and proper.


Dated: January 4, 2024               s/ Kevin R. Carter
                                     Kevin R. Carter (OH Bar No. 0082441)
                                     Frost Brown Todd LLP
                                     301 East Fourth Street, Suite 3300
                                     Cincinnati, OH 45202
                                     Phone: (513) 651-6800
                                     Fax: (513) 651-6981
                                     Email: kcarter@fbtlaw.com

                                     Stacey L. VanBelleghem (*pro hac vice* application
                                     forthcoming)
                                     Latham & Watkins LLP
                                     555 Eleventh Street NW, Suite 1000
                                     Washington, DC 20004
                                     Phone: (202) 637-2200
                                     Fax: (202) 637-2201
                                     Email: stacey.vanbelleghem@lw.com

                                     Karl Karg (*pro hac vice* application forthcoming)
                                     James D. Friedland (*pro hac vice* application forthcoming)
                                     Latham & Watkins LLP
                                     330 North Wabash Avenue, Suite 2800
                                     Chicago, IL 60611
                                     Phone: (312) 876-7700
                                     Fax: (312) 993-9767
                                     Email: karl.karg@lw.com
                                            james.friedland@lw.com

                                     Attorneys for Plaintiff Gavin Power, LLC

0134396.0661055   4861-1398-6458v2