UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

Gavin Power, LLC,

    Plaintiff,

    v.

United States Environmental
Protection Agency, *et al.*,

    Defendants.

Case No. 2:24-cv-41

Judge Michael H. Watson

Magistrate Judge Deavers

## OPINION AND ORDER

This case is about coal ash—a dangerous byproduct of coal-fired electrical power plants like the one Plaintiff Gavin Power, LLC ("Gavin") owns and operates. Across the United States, power plants like Gavin's burn enough coal to collectively generate upwards of one hundred million tons of coal ash annually. *See Hazardous and Solid Waste Management System; Disposal of Coal Combustion Residuals from Electric Utilities*, 80 Fed. Reg. 21,302, 21,303 (April 17, 2015) ("2015 Rule"). That makes coal ash "one of the largest industrial waste streams generated in the U.S." *Id.* Where does all the coal ash go? Coal-fired power plants (Gavin's included) usually dispose of their coal ash on site in underground heaps or pools, called coal-residual units.

Therein lies the danger. Coal-residual units pose serious risks to human health and the environment. *Id.* at 21,433–52. Coal ash contains high quantities of arsenic and other carcinogenic, neurotoxic, ecologically-devasting substances. *Id.* at 21,449–50. Some disasters have put the danger of coal-residual units on

dramatic display. *Id.* at 21,452–59. Most infamously, in 2008, a coal-residual unit in Kingston, Tennessee, suffered a catastrophic structural failure, causing it to release 5.4 million cubic yards of coal-ash sludge across 300 acres and into the nearby Emory River. *Hazardous and Solid Waste Management System; Identification and Listing of Special Wastes; Disposal of Coal Combustion Residuals From Electric Utilities*, 75 Fed. Reg. 35,128, 35,232–33 (June 21, 2010); *see also* Joel K. Bourne, Jr., *Coal's Other Dark Side: Toxic Ash that Can Poison Water and People*, Nat'l Geographic (Feb. 19, 2019). But the danger posed by coal-ash disposal is not always so dramatic. Coal ash can subtly seep out from a coal-residual unit into the fish we eat and the water we drink. 80 Fed. Reg. at 21,449–52; *see also id.* at 21,443–47. Bluntly, coal ash disposal threatens perhaps our most precious natural resource: water.

That is why the Environmental Protection Agency ("EPA") regulates coal-ash disposal under the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6901, *et seq. See, e.g.*, 80 Fed. Reg. at 21,303. After struggling with how to address the scale, complexity, and gravity of the nation's coal-ash problem for decades, the EPA promulgated the first coal ash disposal regulation in 2015. *See generally id.* (codifying 40 C.F.R. § 257.50, *et seq.*); *see also Util. Solid Waste Activities Group* ("USWAG") *v. Envtl. Protec. Agency*, 901 F.3d 414, 420 (D.C. Cir. 2018) (per curiam). The 2015 Rule manifests a concern with (subtle) groundwater pollution. 80 Fed. Reg. at 21,396 (describing "protection of groundwater" as a "prime objective"). For instance, it nixes coal ash disposal in

locations where coal ash is especially likely to intersect with groundwater. *Id.* at
21,471–72 (codifying 40 C.F.R. § 257.60 *et seq.*). It subjects all coal-residual
units to groundwater monitoring. *Id.* at 21,482–8340 (codifying C.F.R. § 257.90
*et seq.*). And, most relevant, when a coal-residual unit closes, the 2015 Rule
requires the site's operator to "[c]ontrol, minimize or eliminate, to the maximum
extent feasible, post-closure infiltration of liquids into the waste and releases of
[coal ash], leachate, or contaminated run-off to the ground or surface waters or to
the atmosphere[.]" *Id.* at 21,489 (codifying 40 C.F.R. § 257.102(d)(1)(i)).

Yet, in this case, Gavin maintains that it complies with the 2015 Rule
despite having a closed coal-residual unit where coal ash is up to 40% flooded
with groundwater. Gavin challenges an EPA action that determined this unit
violates the 2015 Rule. This EPA determination, Gavin says, retroactively
applies a new interpretation of the 2015 Rule. It is therefore arbitrary, capricious,
or an abuse of discretion, Gavin claims. But there is nothing new about the
interpretation that the EPA advanced in the challenged action. Rather, that
action straightforwardly applied requirements evident in the 2015 Rule's plain
text. For this reason, elaborated below, the Court **DISMISSES** Gavin's claims.

## I.    BACKGROUND

### A.    Coal Combustion, Its Byproducts, and Their Disposal

Coal-fired power plants generate electricity. *See generally United States
v. Ohio Edison Co.*, 276 F. Supp. 2d 829, 836 (S.D. Ohio 2003). That process
begins when pulverized coal enters a boiler. *Id.* In the boiler, a furnace burns

the coal, producing gases, which escape through a flue, and steam, which travels through a turbine. *Id.* The steam spins the turbine, the turbine spins a generator, and the spinning generator transforms its kinetic energy into electricity. *Id.*

Aside from electricity, coal combustion also creates residuals, commonly called "coal ash" or "CCRs." *See* 75 Fed. Reg. at 35,137. Coal ash comes in various shapes and sizes. *Id.* Two kinds of coal ash are relevant here: fly ash and bottom ash. Fly ash is a fine, spherical, powdery particle composed mostly of silica; gases carry it upwards into the flue where it is collected. *Id.* Bottom ash, by contrast, is a coarse, angular, sand- or gravel-like ash particle too large to be carried up into the flue, so it gathers in the bottom of the boiler. *Id.*

Coal-fired power plant operators usually dispose of their coal ash in either of two ways. They dump it dry into a "landfill" or mix it with water and pump it into a "surface impoundment." 80 Fed. Reg. at 21,303–04. Landfills, surface impoundments, and other kinds of disposal sites are called "coal-residual units" or "CCR units." *Id.* The type of unit does not strictly correspond to a type of coal ash; fly ash can be stored either in a landfill or a surface impoundment, and the same goes for bottom ash. *Id.*

Coal ash poses serious risks to human health and the environment. *Id.* at 21,449–52; *see also id.* at 21,443–48. Those risk stem from coal ash containing "contaminants of concern," such as arsenic, boron, cadmium, hexavalent chromium, lead, lithium, mercury, molybdenum, selenium, and thallium. 75 Fed Reg. at 35,153; *see also* 80 Fed. Reg. at 21,449. Exposure to these

contaminants correlates with increased likelihood of skin, liver, bladder, and lung cancer. 80 Fed. Reg. at 21,451. Beyond cancer, these contaminants are also linked to harmful neurological, psychiatric, gastrointestinal, cardiovascular, and other effects. *Id.* at 21,451. These contaminants likewise harm the environment. *Id.* The risks to plant and animal wildlife include "elevated selenium levels in migratory birds, wetland vegetative damage, fish kills, amphibian deformities, snake metabolic effects, plant toxicity, mammal uptake, fish deformities, and inhibited fish reproductive capacity." 75 Fed. Reg. at 35,172.

Coal-ash disposal practices can expose humans and the environment to these risks. 80 Fed. Reg. at 21,451, 21,443–48. The EPA has identified several "pathways" for human and ecological exposure. *Id.* at 21,443–44, 21,449–50. They stem from coal-residual units, many of which concentrate "thousands, if not millions, of tons" of coal ash in a single location. *Id.* at 21,328. The coal ash at these sites can leach contaminants into the underlying soil and groundwater. *Id.* at 21,443–44, 21,449–50. This is even more likely in "unlined" coal-residual units, especially surface impoundments. *Id.* at 21,451. Ingesting contaminated groundwater tapped as drinking water is the main exposure pathway for humans. *Id.* at 21,450–51. Contaminated groundwater and run-off also migrate into surface water (rivers, lakes, etc.), leading to environmental harms. 75 Fed. Reg. at 35,172. Ingesting contaminated fish is another significant exposure pathway for humans. 80 Fed. Reg. at 21,450. All told, coal-residual units can endanger us and many of our most important natural resources.

**B.     Statutory and Regulatory Background**

**1.     The RCRA**

To address the health and environmental risks associated with coal ash,

the EPA regulates its disposal under Subtitle D of the RCRA.  *See generally*

*Notice of Regulatory Determination on Wastes from the Combustion of Fossil*

*Fuels*, 58 Fed. Reg. 42,466 (Aug. 9, 1993); *Final Regulatory Determination on*

*Four Large-Volume Wastes from the Combustion of Coal by Electric Utility Power*

*Plants*, 65 Fed. Reg. 32,214 (May 22, 2000); *USWAG*, 901 F.3d at 421–25.

Subtitle D prohibits the disposal of solid waste in "open dumps," 42 U.S.C.

§ 6945(a), and calls on the EPA to "promulgate regulations containing criteria for

determining which facilities . . . shall be classified as open dumps," *id.* § 6944(a).

The RCRA instructs that whatever open-dump criteria the EPA sets must, if

followed, "[a]t a minimum" ensure "no reasonable probability of adverse effects

on health or the environment from disposal of solid waste at such facility."  *Id.*

The EPA lacked the authority to enforce its coal-ash regulations, however,

until Congress passed the Water Infrastructure Improvements for the Nation

("WIIN") Act, Pub. L. No. 114-322, 130 Stat. 1628 (2016).  Before the WIIN Act,

the RCRA's Subtitle D left enforcement to States and citizen suits under 42

U.S.C. § 6972(a)(1)(A).  *See* 80 Fed. Reg. at 21,309.  After the WIIN Act, States

and citizens share Subtitle D enforcement authority with the EPA.  States may

(with EPA approval) adopt a program to "operate in lieu of [EPA] regulation of

coal combustion residual units in the State[.]"  42 U.S.C. § 6945(d)(1)(A).  But

even then, the EPA may bring an enforcement action if a State so requests or if "necessary." *Id.* § 6945(d)(4)(B)(i). And in States without an adequate coal-residual-unit program, the EPA may conduct inspections and issue compliance orders to enforce its own regulations. *Id.* §§ 6945(d)(2)(A), 6927–28. So, though shared, the EPA now enjoys some power to enforce its coal-ash regulations.

## 2. The EPA's 2015 Rule

In 2015, nearly four decades after Congress enacted the RCRA, the EPA finally promulgated its first Rule regulating coal residuals. 80 Fed. Reg. 21,467–500 (codifying 40 C.F.R. § 257.50 *et seq.*). Among other things,[1] the 2015 Rule establishes *which* coal-residual units must close and *how* they must do so.

By setting open-dump criteria, the 2015 Rule effectively determines which coal-residual units must close. The 2015 Rule ties closure to groundwater pollution: a coal-residual unit is an "open dump"—that, per the RCRA, must be retrofitted with a liner or closed—if groundwater sampling reveals an excess of coal-residual constituents in the water table. *USWAG*, 901 F.3d at 447; 80 Fed. Reg. at 21,491 (codifying 40 C.F.R. § 257.101). And the 2015 Rule mandates that groundwater sampling occur "at least semiannual[ly]." 80 Fed. Reg. at 21,397, 21,403, 21,485 (codifying 40 C.F.R. §§ 257.94(b), (d), 257.95(c)). But, until a leak is detected, coal-residual units could continue as usual. That

---

[1] The Rule also established restrictions on the location of coal-residual units; requirements pertaining to coal-residual-unit lining and structural integrity; and criteria for recycling coal ash (*e.g.*, as a cement substitute in road construction). *Id.* (codifying 40 C.F.R. §§ 257.60 *et seq.*, 257.70 *et seq.*, 261.4.)

innocent-until-proven-contamination approach would apply even to existing[2] unlined units—the most dangerous kind of unit, *see id.* at 21,451. Worse yet, fixing a leak (by retrofitting or closing the unit) could take fifteen years. *Id.* at 211,493 (codifying § 257.102(f)). In short, the 2015 Rule required coal-residual units to close when—but not before—the unit contaminated the groundwater.

Beyond which coal-residual units must close, the 2015 Rule also dictates how they must close. The Rule offers two options: "clean" closure and "waste-in-place" closure. *Id.* at 21,491 (codifying 40 C.F.R. § 257.102(a)). If a unit operator selects "clean" closure, they must remove all coal ash from the unit and decontaminate it. *Id.* at 21,492 (codifying 40 C.F.R. § 257.102(c)). If a unit operator selects "waste-in-place" closure, they can leave coal ash in the unit subject to several other requirements. *Id.* (codifying 40 C.F.R. § 257.102(d)). For starters, the unit operator must install a "final cover system," that is designed to "minimize infiltration and erosion" and that meets a set list of minimum standards. *Id.* at 21,491 (codifying 40 C.F.R. §§ 257.102(a), (d)(3)). Before installing that system, the operator must eliminate "[f]ree liquids"[3] from the unit "by removing liquid wastes or solidifying the remaining wastes and waste

---

[2] The 2015 Rule required all new surface impoundments to be constructed with composite lining that effectively secures against leakage. *See* 80 Fed. Reg. at 21474–75 (codifying 40 C.F.R. § 257.72(a)).

[3] The Rule defines "free liquids" as "liquids that readily separate from the solid portion of a waste under ambient temperature and pressure." *Id.* at 21,469 (codifying 40 C.F.R. § 257.53). Although the Rule separately defines "groundwater," the definition of "free liquid" includes groundwater. *Electric Energy*, 106 F.4th at 41.

residues" and "stabilize remaining wastes" to support the final cover system. 80 Fed. Reg. at 21,492 (codifying § 257.102(d)(2)(i)–(ii)). More generally, the unit operator must ensure, among other things, that, "at a minimum, the CCR unit is closed in a manner that will: [c]ontrol, minimize or eliminate, to the maximum extent feasible, post-closure infiltration of liquids into the waste and releases of CCR, leachate, or contaminated run-off to the ground or surface waters or to the atmosphere[.]" *Id.* (codifying § 257.102(d)(1)(i)–(ii)).

### 3. The EPA's 2020 and 2024 Amendments

Not long after the EPA promulgated the 2015 Rule, a group of environmental organizations challenged its innocent-until-proven-contamination approach. *USWAG v. EPA*, 901 F.3d at 420. The environmental organizations argued that this approach (especially as applied to unlined units) betrayed the RCRA's instruction to set open-dump criteria that ensure "no reasonable probability of adverse effects on health or the environment." *Id.* at 427 (quoting 42 U.S.C. § 6944(a)).

The D.C. Circuit agreed. After reciting the EPA's evidence about unlined units, the court concluded that the 2015 Rule "addresses neither the risks to public health and to the environment before leakage is detected, nor the harms from continued leakage during the years before leakage is ultimately halted by retrofit or closure." *Id.* at 429–30. Because the 2015 Rule skirted the risks posed by existing unlined-surface impoundments, the D.C. Circuit held, it was arbitrary, capricious, and contrary to the RCRA. *Id.* at 449. The court therefore vacated

and remanded the provisions of the 2015 Rule that permitted unlined impoundments to continue receiving coal ash until a leak is detected. *Id.*

In response to *USWAG*, the EPA amended the 2015 Rule in 2020 and then again in 2024. *Hazardous and Solid Waste Management System: Disposal of Coal Combustion Residuals from Electric Utilities; A Holistic Approach to Closure Part A: Deadline to Initiate Closure*, 85 Fed. Reg. 53,516 (Aug. 28, 2020) ("2020 Amendment); *Hazardous and Solid Waste Management System: Disposal of Coal Combustion Residuals From Electric Utilities; Legacy CCR Surface Impoundments*, 89 Fed. Reg. 38,950 (May 8, 2024) ("2024 Amendment").

The 2020 Amendment reclassified unlined coal-residual units as "open dumps," which, again per the RCRA, must retrofit or close. *See* 85 Fed. Reg. at 53,516–17. The EPA set a default deadline (April 11, 2021) to stop receipt and start closure, *id.*, but it permitted extensions (up to October 15, 2024), *id.* at 53,546. To qualify for an extension, the 2020 Amendment required the coal-residual-unit operator to demonstrate, among other things, "compliance with all of the other requirements of [coal-residual regulations.]" 85 Fed. Reg. at 53,562 (codifying 40 C.F.R. § 257.103(a)(1)(iii)).

The 2024 Amendment primarily addressed another kind of unit (discussed in *USWAG* but not relevant here): surface impoundments at inactive facilities (called "legacy ponds"). 89 Fed. Reg. at 38,950. As relevant here though, the 2024 Amendment "harmoniz[ed]" some definitions. *Id.* It redefined "liquids" (as

in "[c]ontrol, minimize or eliminate, to the maximum extent feasible, post-closure infiltration of *liquids* into the waste") to mean:

> any fluid (such as water) that has no independent shape but has a definite volume and does not expand indefinitely and that is only slightly compressible. This encompasses all of the various types of liquids that may be present in a CCR unit, including water that was sluiced into an impoundment along with CCR, precipitation, surface water, groundwater, and any other form of water that has migrated into the impoundment, which may be found as free water or standing water ponded above CCR or porewater intermingled with CCR.

89 Fed. Reg. at 39,100. The 2024 Amendment also defined "infiltration" anew (also as in "[c]ontrol, minimize or eliminate, to the maximum extent feasible, post-closure *infiltration* of liquids into the waste") to mean:

> the migration or movement of liquid, such as surface water or ground water, into or through a CCR unit from any direction, including from the surface, laterally, and through the bottom of the unit.

*Id.* Although it adopted these new definitions, the EPA observed that they were unnecessary because the new definitions do not diverge from the plain meaning as reflected in dictionaries. *See, e.g.*, *id.* at 38,995, 39,077.

**C.    Factual and Procedural Background**

**1.    Gavin's Power Plant**

Gavin owns and operates the coal-fired General James M. Gavin Plant in Cheshire, Ohio ("Gavin Plant"). Compl. ¶ 2, ECF No. 36. The Gavin Plant disposes of its coal ash on site. Mot. Ex. A at 9, ECF No. 41-1 ("Final Gavin Denial"). Two of its coal-residual units matter to this suit: the Fly Ash Reservoir and the Bottom Ash Pond. Am. Compl. ¶ 2, ECF No. 36.

The Fly Ash Reservoir is a surface impoundment spanning 314 acres. Final Gavin Denial at 23, ECF No. 41-1. It is unlined. *Id.* at 5. By July 30, 2021, Gavin closed the Reservoir with "waste-in-place." *Id.* at 11. Because Gavin initiated closure of the Reservoir well before the 2020 Amendment's April 2021 deadline, the 2020 Amendment did not affect the Reservoir's closure.

The Bottom Ash Pond is also a surface impoundment. Compl. Ex. C at 9, ECF No. 1-3 ("Proposed Gavin Denial"). It spans almost 60 acres. *Id.* Like the Fly Ash Reservoir, the Pond is unlined. *Id.* But, unlike the Reservoir, Gavin had not begun to close the Pond when the EPA promulgated the 2020 Amendment. *Id.* The Pond was thus subject to closure by the April 2021 default deadline. *Id.*

### 2.    The Final Gavin Denial

Under the 2020 Amendment, Gavin requested until May 4, 2023, to begin waste-in-place closure of the Bottom Ash Pond. Final Gavin Denial at 10, ECF No. 41-1. Gavin timely filed its extension request on November 30, 2022, and supplied all required documents. *Id.*

But, on January 11, 2022, the EPA proposed denying Gavin's extension request. *See generally* Proposed Gavin Denial, ECF No. 1-3. Among other reasons, the EPA proposed denying the extension because Gavin failed to show that the Fly Ash Reservoir complies with all waste-in-place closure requirements. Proposed Gavin Denial at 40, 45, ECF No. 1-3; 40 C.F.R. § 257.103(f)(1)(iii) (conditioning extensions on full facility compliance). The EPA found that the Fly Ash Reservoir was saturated with groundwater. Proposed Gavin Denial at 40–

44, ECF No. 1-3. Compounding the danger associated with groundwater saturation, the Reservoir is unlined. *Id.* at 44. In essence, the EPA found that groundwater could infiltrate the Reservoir, absorb "contaminants of concern," and migrate out of the Reservoir into the broader environment and maybe even our drinking water. This defies, according to the EPA, the 2015 Rule's requirement that Gavin close the Reservoir in a manner that will "control, minimize or eliminate, to the maximum extent feasible, post-closure infiltration of liquids into the waste and releases of CCR, leachate, or contaminated run-off to the ground or surface waters or to the atmosphere." 40 C.F.R. § 257.102(d)(1)(i); *see also* Proposed Gavin Denial at 45–47, ECF No. 1-3 (discussing the 2015 Rule's requirements). So the EPA preliminarily decided that the Reservoir violated that (or another) closure requirement. Proposed Gavin Denial at 48, ECF No. 1-3.

After it promulgated the proposed denial, the EPA solicited comments from January 25 until March 25, 2022. The EPA received about thirty comment letters,[4] including one from Gavin.[5] None altered the EPA's course.

As it proposed to do, the EPA officially denied Gavin's extension request on November 28, 2022, by publishing notice of its final order in the Federal Register. *See generally Final Decision on Request for Extension of Closure Date Submitted by Gavin Power, LLC*, 87 Fed. Reg. 72,989 (Nov. 28, 2022). The EPA

---

[4] Available at <https://www.regulations.gov/document/EPA-HQ-OLEM-2021-0590-0001/comment> (last visited August 20, 2025).
[5] Available at <https://www.regulations.gov/comment/EPA-HQ-OLEM-2021-0590-0076> (last visited August 20, 2025).

ordered Gavin to cease receipt of coal residuals into the Bottom Ash Pond no later than April 12, 2023. *Id.* at 72,990. Expanding on its findings in the proposed denial, the EPA added that all 314 acres of the Reservoir are in contact with some level of water. Final Gavin Denial at 23, ECF No. 41-1. The EPA further estimated that, in total, about 40% of all coal ash in the Reservoir is saturated with groundwater. *Id.* That 40% equates to 8.1 million cubic yards.[6] *Id.* Based on its findings, the EPA reiterated that Gavin's submission failed to show that the Fly Ash Reservoir complied with the waste-in-place closure requirements. *Id.* at 5. For that reason (and others unrelated to the Reservoir's closure), the EPA finally denied Gavin's extension request. *Id.*

Around the same time it issued the Final Gavin Denial, the EPA designated the Gavin Plant as a RCRA "Significant Noncomplier." Am. Compl. ¶ 20, ECF No. 36. The EPA published that designation in its Enforcement and Compliance History Online ("ECHO") database. *Id.*

### 3. Gavin's Legal Challenges

Gavin, along with other coal-fired-power-plant companies, petitioned for judicial review in the D.C. Circuit. *See generally Elec. Energy, Inc. v. Envtl. Protec. Agency*, 106 F.4th 31 (D.C. Cir. 2024). There, Gavin argued that, in denying Gavin's extension request, the EPA amended the 2015 Rule to create a

---

[6] To help visualize, five wheelbarrows have a collective total volume equal to one cubic yard. *See* <https://measuringly.com/how-big-is-1-cubic-yard/> (last visited August 20, 2025); <https://measuringhow.com/how-big-is-a-cubic-yard/> (last visited August 20, 2025).

new waste-in-place closure requirement: no groundwater saturation. *Id.* at 44. By announcing this new requirement, the Final Gavin Denial amounted to a new legislative rule, in Gavin's view. *Id.* And because legislative rules must undergo notice-and-comment procedures, which the Final Gavin Denial never did, Gavin asserted that that the requirement was unlawful. *Id.*

But the Final Gavin Denial is not a legislative rule, the D.C. Circuit held. Distinguishing the Denial from legislative rules, the D.C. Circuit reasoned that it announced no new law. Rather, "EPA regulations adopted long before [the Final Gavin Denial] independently established that unit operators could not close surface impoundments [like the Fly Ash Reservoir] with coal residuals saturated in groundwater." *Id.* at 45. In other words, the minimize-groundwater-saturation requirement "was clear from the text of the 2015 Rule." *Id.* at 40.[7]

Not only did the EPA not announce a legislative rule in the Final Gavin Denial, it did not "announced a rule of any sort[.]" *Id.* at 45. To the contrary, the D.C. Circuit understood the Final Gavin Denial to be an agency adjudication because it "reads and functions like a judicial decision interpreting an agency regulation and then applying it to resolve a case or controversy." *Id.* (internal

---

[7] *See also id.* at 40–42 ("After all, it is the 2015 Rule . . . that requires unit operators closing surface impoundments with waste in place to eliminate 'free liquids' . . . from the impoundment before installing the final cover system. And it is the 2015 Rule . . . that mandates closure in a manner that will 'control, minimize or eliminate, to the maximum extent feasible, post-closure infiltration of liquids into the waste and releases of [coal residuals], leachate, or contaminated run-off to the ground or surface waters.' A unit operator closing a surface impoundment with waste saturated feet-deep in groundwater has neither eliminated 'free liquids' from the impoundment nor controlled the 'infiltration of liquids" into that unit.'" (internal citations omitted))

quotation marks and citations omitted). For these reasons, the D.C. Circuit held that the Final Gavin Denial did not create a new legislative rule. *Id.* at 46.

The RCRA cabins the D.C. Circuit's jurisdiction to "regulations" (legislative rules) and certain other agency actions. 42 U.S.C. § 6976(a)(1)). Because the D.C. Circuit concluded that the Final Gavin Denial does not qualify as an agency action which it has jurisdiction to review, the court dismissed Gavin's case for lack of jurisdiction. *Electric Energy*, 106 F.4th at 47. That brought Gavin here.

Gavin seeks the same outcome in this Court but based on different theories. Gavin presses three Administrative Procedure Act ("APA") claims:

- Gavin's first APA claim alleges, in sum, that the "EPA's retroactive application of the new 2022 Interpretation to the Fly Ash Reservoir closure . . . was arbitrary and capricious, an abuse of discretion, and/or constitutes a prejudicial error, and continues to cause Gavin injury." Compl. ¶ 84, ECF No. 36; *see generally id.* ¶¶ 77–84.

- Gavin's second APA claim alleges, in sum, that the EPA erred in making several determinations (*e.g.*, the Fly Ash Reservoir was not closed in compliance with the applicable Closure Performance Standards at the time of its closure) and that those determinations constitute arbitrary-and-capricious agency action or prejudicial error. *See* Compl. ¶¶ 89–100, ECF No. 36.

- Gavin's third APA claim alleges, in sum, that the "EPA deprived Gavin of Fair Notice and Due Process of its new 2022 Interpretation in violation of the APA." Compl. ¶ 112, ECF No. 36; *see generally id.* ¶¶ 101–13.

Gavin also presses claims titled Waiver and Estoppel:

- Gavin's waiver claim alleges, in sum, that the EPA "waived its right to determine in the Final Gavin Denial that the Fly Ash Reservoir closure, related documentation, or the Facility's groundwater monitoring did not comply with the CCR Rule." Compl. ¶ 127, ECF No. 36; *see generally id.* ¶¶ 114–27.

- Gavin's estoppel claim alleges, in sum, that the EPA is "estopped from challenging the adequacy of Gavin's Fly Ash Reservoir closure [among other things] where the Fly Ash Reservoir Closure Plan was initially approved over seven years ago and the supporting data has been available to EPA for five years or more." Compl. ¶ 142, ECF No. 36; *see generally id.* ¶¶ 128–43.

For relief, Gavin requests: a declaratory judgment, holding unlawful and setting aside the EPA's unlawful, arbitrary, and capricious decisions about Gavin; vacatur of the EPA's determinations in the Final Gavin Denial concerning regulatory compliance at the Facility; an injunction preventing the EPA from pursuing an enforcement action based on the vacated determinations; and an award of attorney's fees, costs, and interest. *Id.* at PAGEID #: 2185–86.

The EPA moves to dismiss under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).  ECF No. 41  The Court addresses that motion below.

## II.    LEGAL STANDARDS

### A.    Federal Rule of Civil Procedure 12(b)(1)

"Rule 12(b)(1) motions to dismiss for lack of subject-matter jurisdiction generally come in two varieties: a facial attack or a factual attack."  *Gentek Bldg. Prods. v. Sherwin–Williams Co.*, 491 F.3d 320, 330 (6th Cir. 2007) (citing *Ohio Nat'l Life Ins. Co. v. United States*, 922 F.2d 320, 325 (6th Cir. 1990)).

The EPA mounts a facial challenge to subject matter jurisdiction.  Mot. 9, ECF No. 41.  "A facial attack on the subject-matter jurisdiction alleged in the complaint questions merely the sufficiency of the pleading."  *Id.*  "When reviewing a facial attack, a district court takes the allegations in the complaint as true" and

construes them in the light most favorable to the nonmoving party, a safeguard like that employed under Federal Rule of Civil Procedure 12(b)(6). *Id.*; *see also United States v. Ritchie*, 15 F.3d 592, 598 (6th Cir. 1994). Hence, the Court accepts all facts in Gavin's Complaint as true and asks if, on those facts, the Court has subject-matter jurisdiction.

## B.     Federal Rule of Civil Procedure 12(b)(6)

A claim survives a motion to dismiss under Rule 12(b)(6) if it "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556). This standard "calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of [unlawful conduct]." *Twombly*, 550 U.S. at 556. A pleading's "[f]actual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* at 555 (internal citations omitted). At the motion-to-dismiss stage, a district court must "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Warner v. Univ. Toledo*, 27 F.4th 461, 466 (6th Cir. 2022) (citation modified). But the plaintiff must provide "more

than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.

## III.  ANALYSIS

The Court begins with Gavin's Ohio common-law waiver and estoppel claims because they straightforwardly fail.  Compl. ¶¶ 114–43, ECF No. 36; Resp. 17–20, ECF No. 45 (clarifying that the claims arise under Ohio common law).  Ohio law no doubt recognizes waiver and estoppel as defenses, but neither doctrine provides a cause of action.  *See, e.g.*, *Faith Lawley, LLC v. McKay*, 175 N.E.3d 1, 9 (Ohio App. 12th Dist. 2021) ("[W]aiver is not a claim"); *Ford Motor Credit Co. v. Ryan*, 939 N.E.2d 891, 921 (Ohio App. 10th Dist. 2010) ("[E]quitable estoppel does not constitute a cause of action.").  On this basis, courts dismiss affirmative claims for waiver and estoppel.  *See, e.g.*, *EHPLabs Research, LLC v. Smith*, No. 5:22CV0653, 2022 WL 3139604, at *8 (N.D. Ohio Aug. 5, 2022) (collecting cases dismissing affirmative estoppel claims because no such claim exists under Ohio law); *Infinity Roofing & Siding, Inc. v. Allstate Ins. Co.*, No. 1:21-CV-889, 2022 WL 19005152, at *1 (W.D. Mich. Dec. 12, 2022) (holding that "a motion to amend is properly denied where it seeks to add claims for equitable estoppel and waiver" because that amendment would be futile).  Following suit, the Court **DISMISSES WITH PREJUDICE** Gavin's waiver and estoppel claims.

That leaves Gavin's APA claims, which require much more analysis. To start, the Court confirms that Gavin's APA claims are justiciable under Rule 12(b)(1).  Then, the Court discusses their merits under Rule 12(b)(6).

**A.    Gavin's APA claims are justiciable.**

The EPA questions (1) Gavin's standing and (2) the ripeness of its claims.

The Court answers below that (1) Gavin has standing to bring its APA claims and

(2) they are ripe.  Thus, the Court holds that Gavin's APA claims are justiciable.

**1.    Gavin properly alleges standing based on reputational harm.**

Article III of the United States Constitution limits federal-court jurisdiction to

certain "Cases" and "Controversies[.]"  U.S. Const. art. 3, § 2.  "The doctrine of

standing gives meaning to these constitutional limits by 'identif[ying] those

disputes which are appropriately resolved through the judicial process[.]'"  *Susan*

*B. Anthony List v. Driehaus*, 573 U.S. 149, 157 (2014) (second alteration in

original) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)).  In

essence, the standing doctrine prompts courts to inquire "whether the plaintiff

has 'alleged such a personal stake in the outcome of the controversy' as to

warrant his invocation of federal-court jurisdiction and to justify exercise of the

court's remedial powers on his behalf."  *Warth v. Seldin*, 422 U.S. 490, 498–99

(1975) (quoting *Baker v. Carr*, 369 U.S. 186, 204 (1962)).

Generally, this means that, to establish Article III standing, a "plaintiff must

show [(a)] an injury in fact, [(b)] fairly traceable to the challenged conduct of the

defendant, [(c)] that is likely to be redressed by the requested relief."  *FEC v.*

*Cruz*, 596 U.S. 289, 296 (2022) (internal citations omitted). Gavin has adequately alleged all three on a reputational-injury theory.[8]

**a. Gavin adequately pleads "injury-in-fact" by alleging that the EPA labelled Gavin as a "Significant Noncomplier."**

Reputational injury generally suffices to establish an injury in fact. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 425, 432–33 (2021). And labels often suffice to establish a reputational injury. *See, e.g.*, *Parsons v. U.S. Dept. of J.*, 801 F.3d 701, 711–12 (6th Cir. 2015) (reputational injury based on the DOJ and FBI labelling an Insane Clown Posse fan group as a "hybrid gang" in the National Gang Intelligence Center threat assessment); *Meese v. Keene*, 481 U.S. 465, 473–76 (1987) (reputational injury based on the DOJ labelling certain films as "political propaganda" under the Foreign Agents Registration Act). A plaintiff need not allege "lost business" or anything so tangible, despite the EPA's contrary insinuations, Reply 12, ECF No. 47. *TransUnion*, 594 U.S. at 425 (collecting cases when an "intangible" harm satisfied the injury requirement).

Gavin adequately pleads a reputational injury here. Gavin alleges that the EPA labelled it a "Significant Noncomplier" in the ECHO database. Compl. ¶ 20, ECF No. 36. That label carries sufficient reputational costs to satisfy the "injury-in-fact" requirement. The "Significant Noncomplier" label resembles, for example, the "hybrid gang" label that satisfied standing in *Parsons*. Notably, both

---

[8] Gavin presses multiple other theories of Article III standing (*e.g.*, pre-enforcement). Because it concludes that Gavin's reputational-injury theory satisfies Article III standing, the Court does not reach Gavin's other theories.

labels allude to past unlawful activity. 801 F.3d at 712; *see also TransUnion*, 594 U.S. at 432 ("[T]his injury bears a "close relationship" to a harm traditionally recognized as providing a basis for a lawsuit in American courts—namely, the reputational harm associated with the tort of defamation."). The Court therefore holds that Gavin alleged an adequate injury.

> **b.    Gavin adequately pleads "traceability" by tying the "Significant Noncomplier" label to the Final Gavin Denial.**

The second prong of the Article III standing test requires Gavin to show that its (reputational) injury "fairly can be traced to the challenged action." *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990) (citation modified). The causation need not be proximate, however. *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 134 n.6 (2014).

Gavin alleges that the EPA attached the "Significant Noncomplier" label to Gavin "as a result of the Final Gavin Denial and the findings of noncompliance contained within it[.]" Compl. ¶ 20, ECF No. 36. Gavin also pleads that "EPA records obtained via a Freedom of Information Act request prove that the Gavin Denial was the basis for this designation." *Id.* The EPA does not specifically address these allegations. Accepting them as true, the Court holds that Gavin satisfies traceability. *See Parsons*, 801 F.3d at 713–14.

> **c.    Gavin adequately pleads "redressability" by asking the Court to set aside and vacate the Final Gavin Denial.**

To meet the third prong of Article III standing, the relief the plaintiff seeks must redress their injury. An injury is redressable if a court order can provide

"substantial and meaningful relief." *Larson v. Valente*, 456 U.S. 228, 243 (1982). But a plaintiff "need not show that a favorable decision will relieve his every injury." *Id.* at n.15; *accord Massachusetts v. EPA*, 549 U.S. 497, 525 (2007). Nor need a plaintiff show that a favorable decision would certainly provide relief; the relevant standard is likelihood—whether "it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Env't Services (TOC) Inc.*, 528 U.S. 167, 181 (2000).

Here, in its prayer for relief, Gavin requests that the Court "hold[] unlawful and set[] aside EPA's unlawful, arbitrary, and capricious decisions as to the [Gavin Plant]" and "[v]acate EPA's determinations in the Final Gavin Denial concerning regulatory compliance at the [Gavin Plant]." Compl., ECF No. 36 at PAGEID #: 2185–86. Having accepted that the "Significant Noncomplier" label traces back to the Final Gavin Denial and the determinations therein, the Court also accepts that vacating the Final Gavin Denial would redress Gavin's reputational injury. Declaring that the Final Gavin Denial wrongly concluded that the Fly Ash Reservoir is noncompliant would likely lift the label and relieve any associated harm. The Court therefore holds that Gavin satisfies redressability.

Having found all three elements met, the Court holds that Gavin has standing to challenge the Final Gavin Denial. The Court shifts now to another justiciability doctrine: ripeness.

### 2. Gavin's challenge to the Final Gavin Denial is ripe.

Ripeness is a justiciability doctrine designed "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Abbott Laboratories v. Gardner*, 387 U.S. 136, 148–49 (1967). The ripeness doctrine is drawn both from Article III and prudence. *See Reno v. Catholic Soc. Services, Inc.*, 509 U.S. 43, 57, n.18 (1993).

Determining whether an administrative action is ripe for judicial review requires a court to evaluate (1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding court consideration. *Abbott Labs*, 387 U.S. at 149; *see also Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 891 (1990) ("Absent [a statutory provision providing for immediate judicial review], a regulation is not ordinarily considered the type of agency action 'ripe' for judicial review under the [APA] until the scope of the controversy has been reduced to more manageable proportions, and its factual components fleshed out, by some concrete action applying the regulation to the claimant's situation in a fashion that harms or threatens to harm him."). Because the Court finds both fitness and hardship met, it concludes that this case is ripe.

### a. Hardship is met because delay would risk reputational harm and increased penalties.

In the "prototypical case of hardship," a "claimant . . . faces a choice between immediately complying with a burdensome law or 'risk[ing] serious criminal and civil penalties.'" *Warshak v. United States*, 532 F.3d 521, 531 (6th Cir. 2008) (quoting *Abbot Labs*, 387 U.S. at 153). And when reputational damage will accrue from noncompliance while awaiting an enforcement proceeding, hardship is even greater. *See Abbot Labs*, 387 U.S. at 153.

Gavin's case fits this prototype. Gavin faces a choice between complying with the regulatory scheme described in the Final Gavin Denial and running the risk of an enforcement proceeding while bearing the "Significant Noncomplier" badge. Thus, withholding decision could cause Gavin hardship.

### b. Gavin's claims are fit because they are near-purely legal, their resolution would speed enforcement, and the Final Gavin Denial is final agency action.

Fitness encompasses several considerations: (i) whether the questions presented are purely legal or, relatedly, whether the questions would benefit from more factual development; (ii) whether earlier resolution would foster, rather than impede, effective enforcement and administration by the agency; and (iii) whether the agency's action constitutes final agency action. *See, e.g., Prod. Credit Ass'n of N. Ohio v. Farm Credit Admin.*, 846 F.2d 373, 374–75 (6th Cir. 1988). All these considerations favor finding Gavin's claims fit for review.

(i) *The question presented (whether the 2015 Rule prohibits closing coal-residual units with coal ash in contact with groundwater) is purely legal and would not benefit from further factual development.* How statutes and regulations should be interpreted are pure questions of law. *Cf. MCI Telecomm. Corp. v. Ohio Bell Tel. Co.*, 376 F.3d 539, 548 (6th Cir. 2004) ("The interpretation of the rule, a question of law, must be reviewed *de novo*"); *Whiteside v. Sec. of Health & Hum. Serv.*, 834 F.2d 1289, 1292 (6th Cir. 1987) ("[T]he dispute is over the purely legal question of how the statute is properly interpreted."). Gavin asks whether the 2015 Rule requires coal-residual units to eliminate contact with ground water before they close. No factual development could change the answer. *See Nat'l. Rifle Ass'n of Am. v. Magaw*, 132 F.3d 272, 291 (6th Cir. 1997). Nor does Gavin challenge the EPA's factual finding that the Fly Ash Reservoir is saturated with groundwater. Thus, Gavin presents a purely legal question that would be unaffected by further factual development.

(ii) *Resolving Gavin's challenge would speed enforcement, no matter the outcome.* If the EPA prevails now, the coal-fired-power-plant industry will know its obligations without having to wait for an enforcement action; if the EPA loses, it can more quickly revise its coal-residual regulatory framework. This dynamic favors finding fitness. *Abbott Labs*, 387 U.S. at 154.

(iii) *The Final Gavin Denial is a final agency action.*[9]  Final agency action "mark[s] the consummation of the agency's decision-making process" and "by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (internal citations omitted).  These two criteria are "flexible" and "pragmatic." *Abbott Labs*, 387 U.S. at 149–50; *see also Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 599 (2016).  The Court finds both met here.

The Final Gavin Denial straightforwardly "consummated" the EPA's decision-making process on whether Gavin deserved an alternative closure deadline.  The "consummation" requirement weeds out initial or intermediate steps in the agency's decision-making process.  *See, e.g., F.T.C. v. Standard Oil Co. of California*, 449 U.S. 232, 238 (1980) ("[T]he Commission's issuance of the complaint was not 'final agency action.'"); *cf.* 5 U.S.C. § 704 ("A preliminary, procedural, or intermediate agency action or ruling not directly reviewable is subject to review on the review of the final agency action.").  The Final Gavin Denial was not an initial or intermediate step.  Rather, it was the final step in the alternative-closure-deadline process.  The Final Gavin Denial followed a proposed decision and a public comment period on that proposal.  And, foundational to its overall decision, the EPA determined in the Proposed and

---

[9] Although "final agency action" may be an independent prerequisite to judicial review of the APA claim, courts often characterize it as an element of ripeness.  *See id.* at 149; *Prod. Credit Ass'n of N. Ohio*, 846 F.2d at 375.

Final Gavin Denials that the Fly Ash Reservoir violated the 2015 Rule's closure requirements. The Final Gavin Denial and its determination about the Fly Ash Reservoir's noncompliance therefore mark the consummation of the EPA's decision-making process.

The Final Gavin Denial also has "legal consequences." Most obviously, the Final Gavin Denial determined that Gavin had no right to an alternative closure deadline for the Bottom Ash Pond. On top of that, the Final Gavin Denial's conclusion about the Fly Ash Reservoir's noncompliance carries legal consequences emulating those found in several U.S. Supreme Court cases. *See Sackett v. E.P.A.*, 566 U.S. 120, 126–27 (2012); *Hawkes*, 578 U.S. at 597–600.

In *Sackett*, the Supreme Court held, outside the enforcement context, that an EPA noncompliance finding had enough legal consequences to be final. *Sackett* confronted whether a Clean Water Act "compliance order" constituted final agency action. 566 U.S. at 125–26. The compliance order there determined that the Sacketts had violated the Clean Water Act by discharging pollutants into navigable waters on their property (just like the Final Gavin Denial determined that the Fly Ash Reservoir violates the RCRA). *Id.* at 122. The Supreme Court concluded that, "[b]y reason of the order, the Sacketts have a legal obligation" to restore the waters on their property or else accrue daily penalties while "wait[ing] for the Agency to drop the hammer." *Id.* at 126–27. That legal obligation, the Supreme Court held, supported finality. *Id.*

Gavin has an analogous obligation by reason of the Final Gavin Denial: fix the Fly Ash Reservoir or else accrue daily penalties while waiting for the EPA, a state, or a citizen to drop the hammer.  Because it carries an obligation analogous to that in *Sackett*, the Final Gavin Denial's noncompliance determination has sufficient legal consequence to be "final."

More lenient still, in *Hawkes*, the Supreme Court intimated that if an agency action warns of major penalties, that warning alone may make it "final." 578 U.S. at 599–600.  Like *Sackett*, *Hawkes* arises under the Clean Water Act. *Id.* at 593.  Unlike *Sackett*, *Hawkes* involves U.S. Army Corps of Engineers "approved jurisdictional determinations," not EPA compliance orders.  *Id.*  These "jurisdictional determinations" advise whether particular property falls within the Clean Water Act's regulatory ambit.  *Id.*  The Supreme Court held that "approved jurisdictional determinations" are final agency action.  *Id.* at 599.  Remarking on how this tracks its pragmatic approach to finality, the Supreme Court observed:

> while no administrative or criminal proceeding can be brought for failure to conform to the approved [jurisdiction determination] itself, that final agency determination not only deprives respondents of a five-year safe harbor from liability under the Act, but warns that if they discharge pollutants onto their property without obtaining a permit from the Corps, they do so at the risk of significant criminal and civil penalties.

*Id.* at 600.

So too here.  The Final Gavin Denial not only deprived Gavin of an alternative deadline but also warned that if Gavin leaves the Fly Ash Reservoir as

is, Gavin does so at the risk of significant penalties. The Final Gavin Denial thereby also carries sufficient legal consequences on *Hawkes*'s warning theory.

In sum, finding both *Bennett* factors met, the Court holds that the Final Gavin Denial is final agency action. This holding should come as no surprise. After all, the Final Gavin Order describes itself as final agency action. It states: "EPA is taking final action to deny the request for an extension based on a determination that Gavin has failed to demonstrate that . . . the Fly Ash Reservoir (FAR) was closed consistent with 40 C.F.R. § 257.102(d)." Final Gavin Denial at 4, ECF No. 41-1. With this statement, the Court agrees.

Finality was the last piece in the justiciability puzzle. Finding hardship and all three fitness factors met, the Court holds that Gavin's challenge is ripe. And, to repeat what the Court held above, Gavin has standing as well. Seeing no other barrier to the justiciability of Gavin's APA claims, the Court turns now to their merits.

## B. On the merits, Gavin fails to allege an APA violation.

Gavin claims that the Final Gavin Denial violates the APA on any of three theories. Gavin's lead theory is that the EPA violated the APA by retroactively applying new law to the Fly Ash Reservoir's closure. *See* Compl. ¶¶ 77–84, ECF No. 36. Gavin's second theory is that the EPA violated the APA by making erroneous determinations. *See id.* ¶¶ 89–100. Gavin's last theory is that the EPA deprived Gavin of procedural due process. *See id.* ¶¶ 101–13. Ultimately, the Court concludes that all three theories, as alleged, fail to state an APA claim.

1.    **Gavin's retroactive-regulation APA claim fails either because the Final Gavin Denial applied no new law or under *Chenery II*.**

Gavin's retroactive-regulation theory relies on a false premise: the Final Gavin Denial newly announced the minimize-groundwater-saturation requirement. In truth, the minimize-groundwater-saturation requirement was not new; the 2015 Rule has always required units closed with waste-in-place to minimize inflow and outflow of groundwater. As discussed below, this conclusion follows either from *Electric Energy* by force of issue preclusion or from this Court's own interpretation of the 2015 Rule's text. Because the Final Gavin Denial applied nothing new, Gavin's retroactive-regulation claim fails.

Even if the Court accepted Gavin's false premise about the Final Gavin Denial's novelty, Gavin's retroactive-regulation claim would still fail under *Chenery II*. The Final Gavin Denial is an agency adjudication. In adjudication, an agency may retroactively apply a new principle if the "mischief of producing a result which is contrary to a statutory design or to legal and equitable principles" is greater than the "ill effect of the retroactive application." *SEC v. Chenery Corp.* 332 U.S. 194, 203 (1947) ("*Chenery II*"). That condition obtains here, as explained below. So Gavin's lead claim would also fail under *Chenery II*.

a.    ***Electric Energy* precludes Gavin's core premise that the Final Gavin Denial newly prohibited groundwater contact.**

The doctrine of issue preclusion bars relitigation of an issue if: (i) the issue is the "same" as one involved in a prior case; (ii) the prior forum provided the to-be-precluded party a "full and fair opportunity" to litigate the issue; (iii) the prior

forum "actually decided" the issue; and (iv) deciding the issue was "necessary" to the prior case's resolution. *Cobbins v. Tenn. Dep't. of Transp.*, 566 F.3d 582, 589–90 (6th Cir. 2009). All these elements are met here.

(i) Both this case and Electric Energy *involve the same core issue: whether the Final Gavin Denial announced any new law.* To the D.C. Circuit, Gavin asserted that the Final Gavin Denial violated the APA because it was a legislative rule promulgated without notice-and-comment procedures. *Electric Energy*, 106 F.4th at 44. This assertion, according to the D.C. Circuit, "boils down to the . . . argument . . . that, in the Gavin Denial, EPA amended the 2015 coal residuals regulation" to prohibit groundwater from migrating in and out of a closed unit. *Id.* at 45 (citation omitted). Gavin's assertion here—the Final Gavin Denial retroactively applies a new interpretation of the 2015 Rule—boils down to this same argument. Wrapping this new-law argument in a different APA theory does not shield it from preclusion doctrine. *See, e.g., Bates v. Shostak*, No. 1:16-CV-534, 2017 WL 5069183, at *4–5 (S.D. Ohio Nov. 3, 2017) (holding that two arguments are the same under preclusion doctrine though they proceeded under different causes of action), *report and recommendation adopted*, 2018 WL 806246 (S.D. Ohio Feb. 9, 2018). A single core issue (whether the Final Gavin Denial announces a new no-groundwater-contact requirement) is critical to both Gavin's argument here and its argument in *Electric Energy*. For issue-preclusion purposes, these arguments are the same.

Bolstering their sameness, Gavin musters the same sub-arguments and evidence to support them. *See Martin v. Bank of New York Mellon Corp., Tr. for Certificateholders CWALT, Inc. Asset-Backed Certificates Series 2004-16CB*, No. 20-3463, 2021 WL 5831097, at *3 (6th Cir. Dec. 9, 2021) ("In general, when 'the same evidence would sustain both issues, then the two issues are the same' for issue-preclusion purposes." (internal citation omitted)). In both *Electric Energy* and here, Gavin argues that the EPA adopted new interpretations of "free liquids" and "infiltrate." *Compare* Compl. ¶ 43, ECF No. 36, *with* Mot. Ex. B at 15, ECF No. 41-2. And Gavin offers the same evidence of a change: the EPA's response to comments, industry reliance, and the EPA's communications with state environmental commissions. *Compare* Compl. ¶¶ 32–35, ECF No. 36, *with* Mot. Ex. B at 9–13, ECF No. 41-2. Gavin's Complaint here even copies some of these arguments near-word-for-word from its *Electric Energy* opening brief. *Compare* Compl. ¶¶ 40–43, ECF No. 36, *with* Mot. Ex. B at 14–16, ECF No. 41-2. The repeated arguments and evidence reinforce the Court's finding that the new-law issue here and in *Electric Energy* are the same. At heart, this case and *Electric Energy* raise the same issue: whether the EPA announced a new closure requirement related to groundwater contact.

    *(ii) Gavin had a full and fair opportunity to—and did—litigate its new-law argument in* Electric Energy. As the citations above prove, Gavin litigated in *Electric Energy* whether the Final Gavin Denial reflected a change in the 2015 Rule. Nothing suggests that the D.C. Circuit provided anything less than a full

and fair opportunity to litigate that issue. This Court thus finds that Gavin had such an opportunity.

*(iii) The D.C. Circuit "actually" rejected Gavin's core new-law argument along with its supporting arguments and evidence.* The D.C. Circuit interpreted the 2015 Rule as "establish[ing] that unit operators could not close surface impoundments [like the Fly Ash Reservoir] with coal residuals saturated in groundwater." *Electric Energy*, 106 F.4th at 45; *see also id.* at 41 ("The 2015 Rule, standing on its own, makes clear that operators cannot close their surface impoundments with groundwater leaching in and out of the unit and mixing with the coal residuals."). Based on that interpretation of the 2015 Rule, the court reasoned, the "EPA did not amend the existing regulations when it spelled that out in the final Gavin Denial." *Id.* at 45. In short, the court concluded that the Final Gavin Denial reflects no new law. Rather, it simply applies the 2015 Rule.

On its way to this conclusion, the D.C. Circuit also rebuffed all of Gavin's supporting arguments and evidence. The court refused Gavin's interpretations of "free liquids" and "infiltration." *Id.* at 41–42. And it cast Gavin's evidence as "simply explain[ing], interpret[ing], and apply[ing] the 2015 Rule's obligations." *Id.* at 43. Thus, *Electric Energy* already rejected not only Gavin's core new-law argument but also all the subpoints and evidence Gavin marshals to support it.

*(iv) Rejecting Gavin's new-law argument was necessary to* Electric Energy's *holding.* Again, the D.C. Circuit ultimately held in *Electric Energy* that it lacked jurisdiction. That court has jurisdiction to review only legislative rules (and

certain other inapplicable agency actions).  For an agency action to be a legislative rule, it must create some new law.  As discussed immediately above, the D.C. Circuit determined that the Final Gavin Denial reflected no new law.  *Id.* at 40–42, 45 ("EPA regulations adopted long before 2022 independently established that unit operators could not close surface impoundments with coal residuals saturated in groundwater.").  On that basis, the court held that it lacked jurisdiction.  *Id.* at 46–47.  The D.C. Circuit's determination that the Final Gavin Denial reflects no new law was therefore necessary to its jurisdictional holding.

Having found all elements of issue preclusion met, the Court concludes that *Electric Energy* has preclusive effect on whether the Final Gavin Denial reflects a change in the 2015 Rule.  Because *Electric Energy* determined that it did not, this Court must do the same.  The Court thus holds that the Final Gavin Denial reflects no new law, eliminating the core premise of Gavin's retroactivity claim.  Without that core premise, Gavin's retroactive-regulation claim falls apart.

> **b.    This Court independently reads the 2015 Rule to prohibit closed units from letting coal ash soak in groundwater.**

Even if *Electric Energy* lacks preclusive effect, its interpretation of the 2015 Rule is unassailable; this Court would adopt the same interpretation by itself.  The Rule's text unambiguously imposes a minimize-groundwater-saturation closure requirement.  Under the 2015 Rule, to close with waste-in-place, a unit operator must "control, minimize or eliminate, to the maximum extent feasible, post-closure infiltration of liquids into the waste and releases of CCR, leachate,

or contaminated run-off to the ground or surface waters or to the atmosphere." 40 C.F.R. § 257.102(d)(1)(i). On Gavin's reading, the word "infiltration" refers only to downward infiltration, and the word "liquids" excludes groundwater. For the same reasons as the *Electric Energy* court, this Court finds Gavin's reading to be, at best, strained. 106 F.4th at 41–42. At bottom, no one would say that the operator of a closed coal-residual unit soaked with countless gallons of groundwater has "controlled, minimized or eliminated, to the maximum extent feasible," either "post-closure infiltration of liquids into the waste" or "release of contaminated run-off to the groundwater." Based on this clear textual command, a closed coal-residual unit violates the 2015 Rule if its waste is waterlogged.

Context confirms this command. A text's "evident purpose" can be an "essential element of context" that informs a court's interpretation. Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 20 (2012). Relatedly, so can "common sense." *Biden v. Nebraska*, 600 U.S. 477, 511–12 (2023) (Barrett, J., concurring); *cf.* The Federalist No. 83, at 559 (Alexander Hamilton) (Jacob E. Cooke ed., 1961) ("The rules of legal interpretation are rules of common sense."). The 2015 Rule describes its "prime objective" as "protect[ing] groundwater." 80 Fed. Reg. at 21,396. Preventing groundwater from infiltrating coal-residual units—where it can absorb coal ash's hazardous constituents and then leach back out—is critical to that end. *Id.*; *see also id.* 21,345 ("Perhaps the most pernicious effect is the contamination of groundwater by leachate from land disposal of waste."). In fact, groundwater infiltration is the

main exposure pathway that the EPA studied. *Id.* at 21,443, 21,449–52. It is also the exposure pathway that motivated the EPA to restrict where coal-residual units can be located, *see id.* at 21,361, and to require groundwater monitoring, *see id.* at 21,396. Yet, according to Gavin, the 2015 Rule leaves this exposure pathway wide open for units closed with waste-in-place. That is, the Rule permits groundwater to infiltrate coal ash in closed units from (almost) every direction on Gavin's read. That cannot be right. To adopt Gavin's interpretation would be to disregard the 2015 Rule's "prime objective" as it pertains to units closed with waste in place, flouting common sense. This context corroborates what was already clear from 2015's Rule's text: a closed coal-residual unit must minimize groundwater infiltration from all directions.

Because Gavin's reading is hopeless as a matter of text and purpose, Gavin resorts to fighting the 2015 Rule's plain meaning with regulatory history. Gavin highlights (i) the 2015 Rule's drafting history; (ii) responses to comments in that rulemaking process; (iii) non-enforcement; and (iv) the 2024 Rule. Compl. ¶ 81, ECF No. 36. In no event could this extra-textual evidence disturb the 2015 Rule's plain meaning. *N.L.R.B. v. SW Gen., Inc.*, 580 U.S. 288, 305 (2017). But even if it could, it would not. None of the regulatory context that Gavin highlights conflicts with reading the 2015 Rule as requiring operators to minimize groundwater saturation in a closed unit.

On drafting history, Gavin underlines the omission of a location-based ban on disposing of coal ash below the water table. That omission proves little.

How the EPA chose to prohibit groundwater contact (closure requirement over location-based ban) does not change that it did impose such a prohibition. *Cf. U.S. Cellular Corp. v. F.C.C.*, 254 F.3d 78, 85 (D.C. Cir. 2001). If anything, this drafting history displays the EPA's constant concern over coal ash mixing with groundwater. As the Court observed above, it would be odd if the 2015 Rule ignored this concern for closed units. The drafting history thus aligns with requiring closed units to prevent groundwater from saturating coal ash.

As for the EPA's response to comments on the 2015 Rule, Gavin pounds one EPA answer: "[t]his rule does not require clean closure of any unit." Compl. ¶¶ 29, 33, 34, 81, 124, 139, 141, ECF No. 36. This response, Gavin believes, conflicts with requiring units closed with waste-in-place to reduce groundwater inflow and outflow. *Id.* ¶ 81. The EPA's response is true but immaterial to the Final Gavin Denial. Clean closure (the subject of the EPA's response) is distinct from requiring units closed with waste-in-place to prevent groundwater inflow and outflow (the subject of the Final Gavin Denial). As Gavin well knows, the difference lies in that clean closure requires the unit operator to remove coal ash, but closure with waste-in-place does not. The Final Gavin Denial never suggests that Gavin must permanently remove coal ash from the Fly Ash Reservoir. And indeed Gavin need not necessarily do so. Under the 2015 Rule, Gavin may leave waste in the Fly Ash Reservoir so long as it complies with all waste-in-place requirements. *See* 40 C.F.R. § 257.102(a); 80 Fed. Reg. at 21,491. All told, the EPA's response on clean closure coheres with the Final Gavin Denial.

On nonenforcement, Gavin emphasizes that the Final Gavin Denial marks the first time that the EPA enforced the minimize-groundwater-saturation requirement. Novelty no doubt cuts against agencies sometimes. *See Biden v. Nebraska*, 600 U.S. at 519 (Barrett, J., concurring) ("A longstanding 'want of assertion of power by those who presumably would be alert to exercise it' may provide some clue that the power was never conferred" (internal citation omitted)); *Util. Air Regul. Group v. E.P.A.*, 573 U.S. 302, 324 (2014) ("When an agency claims to discover in a long-extant statute an unheralded power . . . we typically greet its announcement with a measure of skepticism." (internal citation omitted)). But novelty reveals little here. The power to enforce the no-groundwater-contact requirement is hardly "long-extant": the EPA lacked any power to enforce the 2015 Rule until December 2016 when Congress enacted the WIIN Act. And since then, the EPA has shared enforcement power with States and citizens. *See* 80 Fed. Reg. at 21,309. Plus, the RCRA limits the EPA's enforcement authority in States with approved coal-residual-unit permitting programs (so far Oklahoma, Georgia, and Texas). And, of course, the EPA enjoys broad discretion over when to bring enforcement actions. Overall, the Court finds that a five-year period over which the EPA discretionarily declined to exercise its shared, limited power to enforce the minimize-groundwater-saturation requirement implies nothing about whether that requirement exists.

Finally, regarding the 2024 Rule, Gavin unconvincingly characterizes it as an implicit admission that the 2015 Rule lacks a no-groundwater-contact

requirement for waste-in-place closure. Gavin correctly points out that, to dispel the interpretative argument that Gavin made here and in *Electric Energy*, the EPA redefined the terms "infiltration" and "liquids" in the 2024 Rule. 40 C.F.R. 40 C.F.R. § 257.53; 89 Fed. Reg. at 39,100. But, as evidence of the 2015 Rule's meaning, this subsequent remedial measure has negligible probative value. *Cf.* Fed. R. Evid. 407; 2 Wigmore, Evidence § 283, pp. 174–75. The EPA's new definitions prove only that it believed it could make the minimize-groundwater-saturation requirement clearer. *See* 89 Fed. Reg. at 38,944 ("EPA solicited comments on whether adopting a definition of "liquids" . . . would provide greater clarity."). They do not show that the 2015 Rule omits the requirement, nor that the requirement is even ambiguous; the EPA explicitly disclaimed these inferences. *See, e.g., id.* at 38,995 ("EPA continues to strongly believe that the plain text of the regulation clearly communicates [its] positions, and that in light of the dictionary definition a regulatory definition is not strictly necessary."). Nothing in the 2024 Rule causes this Court to question that the 2015 Rule unambiguously requires closed units to prevent groundwater from saturating coal ash.

In the end, the Court sees no daylight between the plain text of the 2015 Rule and the interpretation of that Rule in the Final Gavin Denial. The Court therefore holds, both independently and as a matter of issue preclusion, that the Final Gavin Denial merely applied existing law. Hence, the Court rejects the core premise of Gavin's lead claim (the Final Gavin Denial retroactively applied a new interpretation). Gavin thus fails to state that claim.

c. **Even if it did something novel and retroactive, the Final Gavin Denial would survive *Chenery II* balancing.**

Retroactivity is not an automatic death knell for final agency action—especially not for agency adjudication. *Chenery II*, 332 U.S. at 203. Much like a court, an agency can, in some cases, develop new legal principles to resolve past conduct through adjudication. *R/T 182, LLC v. F.A.A.*, 519 F.3d 307, 310 (6th Cir. 2008) (citing *Nat'l Lab. Relations Bd. v. Bell Aerospace Co.*, 416 U.S. 267, 294 (1974)).

Courts evaluate these retroactive adjudications with a balancing test. *Chenery II*, 332 U.S. at 203. That is, "retroactivity must be balanced against the mischief of producing a result which is contrary to a statutory design or to legal and equitable principles." *Id.* Building on this line, courts often consider five factors in assessing whether retroactivity is valid: (i) whether the particular case is one of first impression; (ii) whether the new rule represents an abrupt departure from well-established practice or merely attempts to fill a void in an unsettled area of law; (iii) how much the party against whom the new rule is applied relied on the former rule; (iv) the degree of the burden which a retroactive order imposes on a party, and (v) the statutory interest in applying a new rule despite the reliance of a party on the old standard. *See, e.g., J.L. Foti Const. Co. v. Occupational Safety and Health Rev. Commn.*, 687 F.2d 853, 858 n.5 (6th Cir. 1982) (citing *Retail, Wholesale and Dept. Store Union* ("*RWDSU*") *v. NLRB*, 466 F.2d 380, 390 (D.C. Cir. 1972)).

The Final Gavin Denial is an adjudication to which *Chenery II* would apply. The D.C. Circuit (albeit in passing) classified the Final Gavin Denial as a "classic fact-specific adjudication." *Electric Energy*, 106 F.4th at 45. With that classification, this Court concurs. Unlike rulemaking, which announces generally applicable legal principles, agency adjudication involves case-specific determinations that immediately bind parties by retroactively applying law to their past actions. *See, e.g.*, *id.* at 45. The Final Gavin Denial relies on facts specific to the Gavin plant (adjudicative facts) rather than industry-wide generalizations (legislative facts). It applies the 2015 Rule retroactively to Gavin's actions. And, requiring only that the Bottom Ash Pond close on a certain timeline, the Final Gavin Denial binds just Gavin. Although the EPA may treat the Final Gavin Denial as having some precedential value, that does not make it a generally applicable rule. *See, e.g.*, *id.* at 46; *Atchison, T. & S. F. Ry. Co. v. Wichita Bd. of Trade*, 412 U.S. 800, 807 (1973) ("Subject to the qualified role of stare decisis in the administrative process, [agency adjudications] may serve as precedents.'"). The Final Gavin Denial is thus an adjudication subject to *Chenery II* balancing. The Court now marches through the *RWDSU* factors.

    *(i) The first-impression factor favors approving retroactivity here.* Because "[e]very case of first impression has a retroactive effect, whether the new principle is announced by a court or by an administrative agency[,]" applying a new principle retroactively is most valid in cases of first impression. *Chenery II*, 332 U.S. at 203; *see also RWDSU*, 466 F.2d at 390. The Gavin extension

proceeding seems to have been a case of first impression: as Gavin pleads, the Proposed Gavin Denial was the first time that the EPA announced that closed units must minimize coal ash contact with groundwater. *See, e.g.*, Compl. ¶ 42, ECF No. 36. The Court knows of no prior opportunity to apply this same requirement. *Cf. id.* ¶ 71, 81. So this factor supports retroactivity.

(ii) *Rather than abruptly departing from (or even trying to fill a void in) existing law, the Final Gavin Denial newly applies or clarifies existing law.* Retroactive adjudication grounded in "new applications" or "clarifications" of existing law are presumptively valid. *Verizon Tel. Companies v. F.C.C.*, 269 F.3d 1098, 1109 (D.C. Cir. 2001) (citation modified); *cf. Orr v. Hawk*, 156 F.3d 651, 654 (6th Cir. 1998) ("So long as a change in a regulation does not announce a new rule, but rather merely clarifies or codifies an existing policy, that regulation can apply retroactively."). As discussed above, the minimize-groundwater-saturation requirement flows straight from the plain text of the 2015 Rule. At worst then, the Final Gavin Denial "newly applies" that requirement to a closed unit where groundwater saturates coal ash. Or perhaps it "clarifies" that such a unit fails to minimize, as much as possible, "post-closure infiltration of liquids into the waste" and "release of contaminated run-off to the groundwater" (though this could hardly be described as unclear). No matter how one reads the 2015 Rule, the Final Gavin Denial could not be described as an "abrupt departure." Thus, this factor strongly favors the Final Gavin Denial's validity.

(iii) *Gavin alleges reliance, but it is not "serious" reliance.*[10]  According to
Gavin, the Plant's previous owner closed the Fly Ash Reservoir "in reliance on
EPA's then-applicable interpretation of the RCRA closure requirement."  Compl.
¶ 19, ECF No. 36; *see also id.* ¶¶ 35, 83–84.  But "serious" reliance arises from
only "longstanding policies" that are not endowed to an agency's "enforcement
discretion."  *See Food and Drug Administration v. Wages and White Lion
Investments, L.L.C.*, 145 S. Ct. 898, 925–27 (2025).  Gavin's interpretation of the
2015 Rule could not have been "longstanding."  Gavin built up about seven years
of reliance on its interpretation of the 2015 Rule.  Seven years falls far short of
the decades that the Supreme Court's change-in-position cases require.  *Id.* at
927 (citing *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221–222 (2016)).
Plus, the 2015 Rule gives the EPA enforcement discretion.  Gavin may have
(wishfully) believed that the EPA would not enforce the 2015 Rule's closure
requirement against closed units with coal ash flooded in groundwater.  But this
belief—a "belief about how an agency is likely to exercise its enforcement
discretion"—cannot support a "serious reliance interest."  *Id.* (citing *FCC v. Fox
Television Stations, Inc.*, 556 U.S. 502, 515 (2009)) (citation modified).  So,

---

[10] Even if they were serious, the EPA would not have needed to consider them.
Agencies need only consider reliance when they change course.  *Tennessee v. U.S.
Dept. of Health and Human Services*, 720 F. Supp. 3d 564, 590 (E.D. Tenn. 2024)
(citing *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (2020)),
*aff'd sub nom. Tennessee v. Becerra*, 117 F.4th 348 (6th Cir. 2024), *and aff'd sub nom.
Tennessee v. Becerra*, 131 F.4th 350 (6th Cir. 2025).  The EPA did not change course
in the Final Gavin Denial.  Rather, it pursues the same course that the plain text of the
2015 Rule charts.  The EPA thus did not need to consider Gavin's reliance interests.

although Gavin nominally alleges reliance interests, they are not "serious" enough to block any supposed retroactivity.

 *(iv) Gavin alleges that the Final Gavin Denial imposes a heavy burden.* Without giving specifics, Gavin says that minimizing groundwater in the Fly Ash Reservoir would entail "substantial costs and disruption."  Compl. ¶ 19, ECF No. 36.  This would count against retroactivity if Gavin's reliance were serious.

 *(v) The no-groundwater-contact requirement advances the RCRA's interests.*  The RCRA sets the baseline that solid waste disposal sites (including coal-residual units) pose "no reasonable probability of adverse effects on health or the environment."  42 U.S.C. § 6944(a).  Allowing coal ash to saturate groundwater in an unlined surface impoundment (like the Fly Ash Reservoir) poses an intolerably high probability of adverse effects on health and the environment.  *See USWAG*, 901 F.3d at 421, 426–34.  Requiring these units to minimize the inflow and outflow of groundwater thus furthers the RCRA's main purpose.  The EPA applied this requirement in the Final Gavin Denial to the Fly Ash Reservoir, with its estimated 8.1 million cubic yards of saturated coal ash. So the statutory-interest factor also strongly favors applying the minimize-groundwater-saturation requirement in the Final Gavin Denial.

 All in all, the *Chenery II* scales tilt heavily toward applying the minimize-groundwater-saturation requirement.  The Court would uphold the Final Gavin Denial even if it newly announced and applied that requirement (which it did not).

***

In sum, Gavin's retroactive-regulation claim fails under Rule 12(b)(6). Nothing about the Final Gavin Denial was retroactive; it merely applied the existing minimize-groundwater-saturation closure requirement that this Court and the D.C. Circuit read in the 2015 Rule's plain text. And even if it were new, *Chenery II* would condone retroactively applying the minimize-groundwater-saturation requirement in the Final Gavin Denial. Seeing no way Gavin could fix its retroactive-regulation claim with an amendment, the Court **DISMISSES WITH PREJUDICE** Count I.

2. **Gavin's erroneous-finding claim fails because the EPA applied the correct law to seemingly well-found facts.**

Gavin's second APA claim alleges that the EPA erred in several determinations related to the Gavin Plant's compliance. But Gavin does not precisely identify the error. Gavin does not specify, for instance, whether the EPA's errors were legal or factual. In its Complaint, Gavin refers generally to "determinations" on questions that mix fact and law. *See* Compl. ¶¶ 89–100, ECF No. 36. Gavin sometimes seems to suggest that its grievances are legal. *See, e.g., id.* ¶ 88 ("EPA exceeded its authority by applying its new requirements to the Fly Ash Reservoir and attempting to require a revision to the Fly Ash Reservoir Closure Plan for a reason that is not specifically enumerated in the regulations."). But other times, Gavin refers to its second claim as "fact-specific." Resp. 6, ECF No. 45 (citing Compl. ¶¶ 91, 93, 96, 97, ECF No. 36). No matter whether Gavin grumbles with law or fact, it fails to state an APA claim in Count II.

No plausibly alleged legal error props Gavin's second APA claim. As the Court concluded above, the EPA did not err legally by applying the minimize-groundwater-saturation requirement. Applying that requirement to the Fly Ash Reservoir alone suffices to support the Final Gavin Denial. So, even if Gavin identifies other legal errors, the errors would be too "harmless" to support its claim. *Japarkulova v. Holder*, 615 F.3d 696, 701 (6th Cir. 2010); *see also* 5 U.S.C. § 706; *White Lion*, 145 S.Ct. at 930.

Nor does Gavin allege factual errors that could support its second claim. The standard for judicial review of agency factfinding in informal adjudications is highly deferential: an agency need only "articulate a rational connection between the facts found and the choice made and . . . provide something in the way of documentary support for its action." *Hosseini v. Nielsen*, 911 F.3d 366, 371 (6th Cir. 2018) (citation modified). The Final Gavin Denial easily clears that low bar. The Denial details the three lines of evidence on which the EPA relied and explains how each show that Fly Ash Reservoir contains coal ash saturated with groundwater. *See* Final Gavin Denial at 17–19, ECF No. 41-1; Proposed Gavin Denial at 41–44, ECF No. 1-3. This evidence remains unrefuted. The Court will not second-guess the EPA's yet undisputed factual findings.

Gavin thus fails to plausibly allege a specific legal or factual error. Without a specific legal or factual error, Gavin's second claim fails. Because Gavin could, in theory, address this deficiency by amending to allege an error, the Court **DISMISSES WITHOUT PREJUDICE** Count II.

3. **Gavin's procedural-due-process claim fails because the 2015 Rule's plain text notifies it of the minimize-groundwater-saturation closure requirement.**

The Fourteenth Amendment's Due Process Clause bars States from "depriv[ing] any person of life, liberty, or property, without due process of law[.]" U.S. Const. amend. XIV, § 1. "An essential principle of due process is that a deprivation of life, liberty, or property 'be preceded by notice and opportunity for hearing appropriate to the nature of the case.'" *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985) (quoting *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 313 (1950)). A corollary of this essential principle is that agencies cannot apply a regulation that is so vague that it fails to give fair warning of the conduct it prohibits or requires. *See, e.g.*, *Wolverine Pipe Line Co. v. U.S. Dept. of Transp., Pipeline and Hazardous Materials Safety Administration*, 69 F.4th 365, 374 (6th Cir. 2023); *Ohio Edison*, 276 F. Supp. 2d at 885–86. Gavin protests, with its third APA claim, that it lacked fair notice of the minimize-groundwater-saturation requirement. Compl. ¶ 111 ECF No. 36

But Gavin had adequate notice of the minimize-groundwater-saturation requirement. In fact, Gavin "received, or should have received, notice of" the requirement "in the most obvious way of all: by reading the regulations." *Gen. Elec. Co. v. E.P.A.*, 53 F.3d 1324, 1329 (D.C. Cir. 1995); *see also Ohio Edison*, 276 F. Supp. 2d at 886 ("In some cases, the plain language of the regulation itself suffices to show that the defendant had fair notice or a lack of fair notice of the administrative agency's interpretation of the regulation."). Again, on this

Case No. 2:24-cv-41                                                              Page 48 of 49

Court's and the D.C. Circuit's read, the 2015 Rule's text conveys the minimize-groundwater-saturation requirement.  The EPA thus gave adequate notice of it.

Because Gavin's only gripe is with notice of that requirement, the Court concludes that Gavin fails to state a procedural-due-process claim.  In case Gavin has other objections to the process, to be safe, the Court **DISMISSES WITHOUT PREJUDICE** Count III.

## IV.    CONCLUSION

To recap, for the reasons above, the Court holds that Gavin has failed to state a claim under Federal Rule of Civil Procedure 12(b)(6).  On that ground, the Court **GRANTS** the EPA's motion to dismiss.  It **DISMISSES WITH PREJUDICE** Counts I, IV, and V.  And it **DISMISSES WITHOUT PREJUDICE** Counts II and III.  Because this renders moot both the Sierra Club's motion to intervene, ECF No. 40, and the EPA's motion to stay discovery, ECF No. 51, the Court **DENIES WITHOUT PREJUDICE** those motions as well.  Lastly, **WITHIN THIRTY DAYS** of this Opinion and Order, Gavin **SHALL** file a notice on the docket stating whether it intends to amend Count II or III.  If Gavin states that it intends to amend, then **WITHIN FOURTEEN DAYS** of that notice, the Sierra Club **SHALL** file a notice stating whether it still wishes to intervene.

The Clerk shall terminate ECF Nos. 40, 41, and 51.

**IT IS SO ORDERED.**

**MICHAEL H. WATSON, JUDGE**
**UNITED STATES DISTRICT COURT**